Filed 4/25/14 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>GIAI VAN NGO,<br><br>　　　Defendant and Appellant. | H038673<br>(Santa Clara County<br>Super. Ct. No. C1083378)<br><br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING**<br><br>**NO CHANGE IN THE JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on March 28, 2014, be modified as follows:

1. On pages 29 to 30, in the first full paragraph, the following sentences, which state:

This erroneous instruction cannot be described as "ambiguous"; it is clearly and concededly erroneous on its face. While the instructions taken as a whole contained some ambiguity, in that a jury could choose among two competing instructions, it is more precise to say the instructions were in direct conflict. The jury was "clearly instructed by the court that it may convict a defendant on an impermissible legal theory, as well as on a proper theory or theories." (*Boyde*, *supra*, 494 U.S. at p. 380.) Thus, "[a]lthough it is possible that the guilty verdict may have had a proper basis, 'it is equally likely that the verdict . . . rested on an unconstitutional ground,' . . . ." (*Ibid.*) As *Boyde* instructs, we should "decline[] to choose between two such likely possibilities." (*Ibid.*) Because the verdict here could have rested on an unconstitutional ground, in violation of defendant's federal constitutional rights, the erroneous instruction requires reversal unless the Attorney General can show beyond a reasonable doubt that the error did not contribute to the verdict.

are deleted and the following sentence is inserted in its place:

> This erroneous instruction, considered in isolation, cannot be described as "ambiguous"; it is clearly and concededly erroneous on its face. That being said, the instructions taken as a whole could be characterized as ambiguous, in that a jury could choose between two conflicting instructions. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 73-73.)

2. On page 30, the first full paragraph, which states:

> The Attorney General identifies nothing in the record to suggest the jury ignored the erroneous instruction or otherwise applied it correctly. The jury asked no questions about the instruction or related matters. Nobody interviewed the jurors or presented other evidence of how they interpreted the instruction. The court said nothing to suggest that one instruction should be given priority over the other. Nothing "in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other." (*Francis v. Franklin* (1985) 471 U.S. 307, 322.) On this record, the Attorney General has not shown harmless error.

is deleted.

3. On page 30, the first sentence of the second full paragraph, which states:

> Even under the Attorney General's proposed standard, in which reversal is required only if it is reasonably likely the erroneous instruction confused or misled the jury, we find a reasonable likelihood that the jury was misled and defendant was harmed.

is deleted, and the following sentence is inserted in its place:

> We need not decide which standard of review applies here. Even under the Attorney General's proposed standard—whether it is reasonably likely the erroneous instruction confused or misled the jury—we find a reasonable likelihood that the jury was misled and defendant was harmed.

The petition for rehearing is denied.

There is no change in the judgment.

(Márquez, J., and Grover, J., participated in this decision. Bamattre-Manoukian, Acting P.J., would be of the opinion that the petition should be granted.)

2

Dated:_____          _____
                                       Márquez, J.


                                       _____
                                       Grover J.


People v. Ngo
H038673

3

Filed 3/28/14; Reposted to correct footnote numbering, no change to content (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038673 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1083378) |
| v. | |
| GIAI VAN NGO, | |
| Defendant and Appellant. | |

Defendant Giai Van Ngo was first tried by jury in 2011 for the conduct at issue in this appeal. The jury hung on all counts, and defendant was tried again in 2012. The second jury found defendant guilty on four counts: Count One—sexual penetration with a child aged 10 or younger; Counts Two and Four—lewd or lascivious acts on a child by force; and Count Three—simple battery. (Pen. Code, §§ 288.7, subd. (b), 288, subd. (b)(1), 242, 243, subd. (a)).[1] The court imposed a term of 15 years to life, consecutive to a determinate term of 12 years.

On appeal, defendant raises three claims of instructional error arising out of the second trial. First, he contends that an erroneous unanimity instruction, by misstating "2009" as "2010," allowed the jury to convict him on Count Four—an offense alleged to have occurred in 2009—based on separate conduct that occurred in 2010. Second, defendant contends the court failed to instruct the jury on the lesser included offense of attempted sexual penetration with respect to Count One. Third, defendant argues the

---

[1] Subsequent undesignated statutory references are to the Penal Code.

court erroneously instructed the jury on general intent as to the charge of sexual penetration, a specific intent crime.[2]

We hold the court erred in all three respects, but find only the first two errors prejudiced defendant. Because the errors require reversal on only two counts, we will remand for resentencing and possible retrial on those counts only. As to Count One, we will give the prosecution the option of retrying defendant or accepting a conviction of attempted sexual penetration of a child aged 10 or younger.

## I. FACTUAL BACKGROUND

In 2010, defendant was a 66-year-old fruit vendor living in a three-bedroom house in San José. He rented one bedroom of the house to N.T. (Mother) and her seven-year-old daughter, B.T.[3] Defendant lived in his own, separate bedroom. The evidence concerns two incidents in which defendant touched B.T. while they were in the living room of the shared house. The first incident occurred on an unknown date in 2009. The second incident occurred on July 24, 2010.

A. *The 911 Call*

On July 24, 2010, Mother called 911 and told the dispatcher, through a Vietnamese interpreter, that defendant had touched B.T.'s stomach while holding her against her will. At trial,[4] the prosecutor played an audio recording of the call for the jury and provided them with a transcript.

Mother told the dispatcher that B.T. was scared and crying, that B.T. had hit defendant, and that B.T. was trying to push him away. The dispatcher instructed Mother

---

[2] Defendant raised this claim after we requested supplemental briefing on the level of intent required under § 288.7, subdivision (b), and whether the trial court properly instructed on it.

[3] To protect the anonymity of the minor, we refer to her by her initials, and we refer to her mother as "Mother." We intend no disrespect.

[4] All references to "trial" refer to the second trial in 2012 unless otherwise specified.

to ask B.T. whether defendant touched her vagina. According to a transcript of the call, Mother gave an unintelligible response to the dispatcher's instruction. Mother said, however, that she took off B.T.'s pants to examine her and saw that defendant's fingernail had made a small scratch on B.T.'s stomach. A photograph, later introduced at trial, shows a light, red scratch approximately one to two inches long on B.T.'s stomach.

The dispatcher asked to speak to B.T., who spoke with the dispatcher in English. The dispatcher asked if defendant touched her "privates," but B.T. did not understand that word. B.T. said "he touched me everywhere." The dispatcher asked if defendant told her to keep anything secret, and B.T. said that he did.

The dispatcher asked to speak with Mother again, and requested various details about defendant's appearance and circumstances. Mother added that he had touched B.T. on another occasion about a year before. Mother said her cousin confronted defendant about the incident, but defendant denied it.

B. *Officer O'Neil's Investigation*

San José Police Officer Melinda O'Neil arrived at the house the same day and spoke with B.T. in English. Officer O'Neil recorded her interview with B.T. At trial, the prosecutor played the audio recording of the interview for the jury and provided them with a transcript.

B.T., motioning with her hands, told Officer O'Neil that defendant was "touching me over here." Seeking to clarify the meaning of B.T.'s hand motions, Officer O'Neil asked, "Okay, so you're pointing to like your, your breast area, right?" B.T. responded, "Yeah." Officer O'Neil asked, "And anywhere else?" B.T. responded, "Um, no, just there."

Officer O'Neil then instructed B.T. to touch herself in the same places where defendant touched her:

"[Question:] Okay. He, did he touch you, can you, can you touch where he touched you, so I can tell exactly?

3

"[Answer:] Here, here, here, here, all around me.

"[Question:] Okay, your belly?

"[Answer:] Yeah.

"[Question:] You're pointin' to your belly?

"[Answer:] Yeah.

"[Question:] And your, and your breasts, right?

"[Answer:] Yeah.

"[Question:] Okay. Do you have a name for that, or do you just call that your, you just say that [is] your chest area, right?

"[Answer:] I didn't say it to him, but he did it hisself [*sic*].

"[Question:] Okay. Did he touch anywhere else?

"[Answer:] No, that's where he touched."

Officer O'Neil then asked B.T. how many times defendant had previously touched her. B.T. said defendant had touched her "last year." Officer O'Neil asked what happened and where defendant touched B.T.:

"[Question:] What, what happened last year?

"[Answer:] Last year he even touched me the same time, like this year.

"[Question:] Where did he touch you last year?

"[Answer:] He, he touched over here, here, and all around over here.

"[Question:] Okay. Same spots as today?

"[Answer:] Yeah.

"[Question:] Anywhere else?

"[Answer:] No. That's when he just touched me."

At trial, Officer O'Neil testified that when B.T. described the incident from 2009, B.T. was waving her hands over the parts of her body where defendant touched her. B.T. was "pointing to her chest area, her abdomen, and a little bit lower than that."

4

Officer O'Neil then asked B.T. more questions about when the prior incident happened, but B.T. could not remember what month or what time of year it happened. She only knew that it was 2009. B.T. said the incident occurred in the living room, and that Mother walked into the room and saw it happening.

B.T. said Mother also saw the incident on July 24, 2010. B.T. said defendant did not say anything during the incident. B.T. was mad, and she told defendant she did not like him. B.T. tried to get away, but defendant held on to her to prevent her from escaping. Defendant released her when Mother walked into the room.

B.T. then described further details of the 2010 incident. She said defendant was lying on the living room couch and she was sitting on the couch when he pulled her towards him. Defendant said, "Come here," and "Come here right now," in Vietnamese, but B.T. did not want to. B.T. said he put his hand up under her shirt. Officer O'Neil asked if defendant touched B.T. "down in this area" while Officer O'Neil pointed towards her own vaginal area. B.T. said, "Yeah." Officer O'Neil then asked B.T. if defendant touched her on the buttocks, while Officer O'Neil pointed to her own buttocks. B.T. said he did not.

Officer O'Neil then sought to clarify whether defendant touched B.T. in the vaginal area. B.T. did not know any word or name for the area, but Officer O'Neil referred to it by pointing. In response to further questioning, B.T. said defendant's hand went under her underwear and touched her skin. B.T. added that after touching her, defendant kissed her. Officer O'Neil did not ask any follow-up questions about that allegation, and instead changed to routine questions about B.T.'s daily life.

After some time, Officer O'Neil asked again about the 2009 incident. B.T. pointed to her own vaginal area and said defendant touched her there. B.T. did not recognize the word "vagina" but said her mother referred to that area using a Vietnamese word that sounded like "chim."

5

Officer O'Neil then asked B.T. if defendant touched her there in 2009 as well, and B.T. said "Yeah." B.T. said defendant was lying on a bed in the living room while she was sitting on the couch. Defendant grabbed her and pulled her towards him. B.T. said Mother walked into the room and defendant stopped.

Officer O'Neil then repeatedly asked B.T. if she was sure there were only two incidents, and no other incidents. B.T. consistently responded that there were only two incidents.

Finally, without specifying a time frame, Officer O'Neil asked B.T. if defendant put his fingers inside her vaginal area:

"[Question:] Did he put his um, did he put his fingers inside there?

"[Answer:] Yeah.

"[Question:] Um, do you understand what I'm saying by that?

"[Answer:] Um, like you have this area where you go pee, right?

"[Question:] Yeah.

"[Answer:] Yeah.

"[Question:] Did he put his fingers in there?

"[Answer:] In here?

"[Question:] In, in, in this area, where you go pee.

"[Answer:] Yeah.

"[Question:] Or he just touched the outside area—or did he actually put his finger inside?

"[Answer:] In.

"[Question:] In you?

"[Answer:] Yeah.

"[Question:] Did that, how did, did that hurt, or-

"[Answer:] Yeah, it does, it hurts.

"[Question:] Does that hurt right now?

6

"[Answer:] Now, no."

Officer O'Neil then ended the interview. In her report on the matter, Officer O'Neil wrote, "I was unable to determine whether or not Ngo actually penetrated her vaginal opening with his fingers." Notwithstanding what she wrote in her report, Officer O'Neil testified at trial that she believed B.T. had been penetrated.

Officer O'Neil did not request a physical examination of B.T. Officer O'Neil testified that she had no experience in sexual assault cases and only a "small amount" of "very limited" training in sexual assaults. Officer O'Neil collected DNA swabs from B.T.'s chest and the scratch on her abdomen, but did not collect a swab from B.T.'s vaginal area. The parties stipulated that DNA on the swab from B.T.'s chest matched defendant's DNA.

### C. *Officer Truong's Investigation*

On the same day, San José Police Officer Tam Truong, a certified Vietnamese language officer, interviewed both Mother and B.T. in Vietnamese. He interviewed Mother first. Mother described what she saw earlier that day. She was walking out of her bedroom when she saw defendant's hand inside B.T.'s pants. His wrist was at the level of the waistband. Defendant was holding B.T. with his arms wrapped around her. He was holding both of her hands. When Mother yelled at him, he let B.T. go, and she ran towards Mother. B.T. was upset. Mother took her into their bedroom, where Mother questioned her about what happened. Mother then called 911.

Mother told Officer Truong that B.T. said defendant touched her on the chest and stomach. Mother said she did not believe defendant had penetrated B.T. Mother thought that if defendant had penetrated B.T., there would have been blood, or B.T. would have shouted, but neither occurred. Officer Trung twice asked Mother if B.T. had ever said defendant had touched her before, and Mother said B.T. had not.

Officer Truong then interviewed B.T., after Officer O'Neil had interviewed her. He recorded the interview without telling B.T. he was doing so. At trial, the prosecutor

7

played the recording for the jury and provided them with a transcript of an English translation.

B.T. told Officer Truong she was sitting on the arm rest of the couch in the living room at the start of the incident that day. Defendant was pretending to sleep on the couch. He then pulled her towards him and touched her stomach and chest inside her shirt with both hands. Using her hands to demonstrate what happened, B.T. indicated that defendant touched her near her vaginal area with his right hand. Officer Truong asked if defendant touched "the place where you urinate," and B.T. responded affirmatively.[5] Officer Truong then asked, "When he touch the place of urinate of yours did he . . . . he put his whole hand of his in there, or did he touch on the top of the place of urinate of yours?" B.T. responded, "No. Just this place." Officer Truong testified that B.T. then showed him defendant's hand went into her underwear up to his wrist. B.T. said his hand did not go as far as her buttocks.

Officer Truong then tried to determine whether defendant penetrated B.T.'s vagina:[6]

"[Question:] Do you think he touched above the hole or the entire hole?

"[Answer:] Above the hole.

"[Question:] Above the hole. Uh. If he touched, did he, he was limp? Did he use the whole hand or just the finger(s)?

"[Answer:] The whole hand.

"[Question:] The whole hand. (When) he touched, he he [*sic*] caress or did he just put it in?

"[Answer:] He just caressed.

---

[5] All quotations of this interview are taken from the transcript of the English translation.

[6] This portion of the transcript provided by the prosecution contains gaps. The portion quoted here is taken from defendant's version of the transcript.

8

"[Question:]  He caressed like this?

"[Answer:]  Um-huh.

"[Question:]  He went right and then left like this?

"[Answer:]  Um-huh."

B.T. did not know for how long defendant did this.  She said that while he was touching her, his left hand was touching her chest inside her shirt.  She did not feel pain in either area.  Defendant did not say anything to her, and she did not say anything.  She felt embarrassed and did not like it.  B.T. hit defendant.  She tried to get away, but she could not because defendant had his arm wrapped around her.  Mother then entered the room and yelled "Don't do that."  Defendant's hand was not in her pants at that point.  He did not say anything.  B.T. ran to Mother, who then called the police.  Officer Truong tried to clarify whether defendant penetrated B.T.:

"[Question:]  Did he—did he put his finger into the hole that you urinate with?

"[Answer:]  No.

"[Question:]  No.  He just touch?

"[Answer:]  Mm hmm."

Officer Truong then asked B.T. whether "this kind of thing" had ever happened before.  B.T. said there was another incident "last year" in 2009, but she could not remember the date.[7]  At the time, there was a bed in the living room.  B.T. went into the living room to watch television.  Defendant was lying on the bed.  He pulled her up onto the bed and touched her on the chest with both hands.  He also touched her "down there where you urinate" with his right hand.  Officer Truong sought to clarify:

"[Question:]  He . . . touch on the top part of the place where you urinate,

where?  Was it the whole hole?  He—His hand (UNTELLIGIBLE) the hole?

"[Answer:]  Yeah.

---

[7] B.T. later said it happened in the wintertime.

9

"[Question:]  Which one?

"[Answer:]  Um . . . (VIETNAMESE)  this one.

"[Question:]  (VIETNAMESE)  His whole hand (UNTELLIGIBLE) into the hole?

"[Answer:]  Uh huh."[8]

B.T. said that defendant did not say anything up to that point.  B.T. told him to "take it out."  Mother then came into the room, and B.T. hit defendant on the chest.

Officer Truong again sought to clarify whether defendant penetrated her:

"[Question:]  At that time, did he put his hand in the hole where you urinate?

"[Answer:]  No.

"[Question:]  Did he put his hand deep in there to the point where he touch your butt?

"[Answer:]  No.

"[Question:]  He went from front going down?

"[Answer:]  Huh?

"[Question:]  Did he touch from front going down?

"[Answer:]  Yes.

"[Question:]  Were you hurt? At that time were you hurt?

"[Answer:]  Hurt a bit.

"[Question:]  Where were you hurt?

"[Answer:]  Right here.

"[Question:]  The place where you urinate?

"[Answer:]  Uh huh."

B.T. said there was no bleeding.  Officer Truong asked again whether defendant put his hand into "the hole where you urinate," and B.T. said "No."  She said it "hurt for just a bit."

---

[8] Officer Truong testified that his impression was B.T. was not claiming defendant put his hand into her vagina at this point in the interview.

10

B.T. said Mother saw what happened. B.T. also told Mother about the touching. Mother told defendant "Don't do that." Defendant responded that he was only playing, and Mother accused him of lying.

Officer Truong then elicited additional details about the 2010 incident. B.T. said defendant scratched her on the stomach. He was holding onto both of her hands while he was touching her. Officer Truong asked B.T. how many times defendant touched her vaginal area. At first, B.T. said she did not know. After further prompting, she responded that defendant touched her four times. She then said he touched her five times. But he only put his hand under her pants once. He touched her chest six times.

After interviewing B.T., Officer Truong told Officer O'Neil he had determined there had been no vaginal penetration. No Sexual Assault Response Team (SART) examination was ever performed on B.T.

D. *Defendant's Statement*

Several days after the 2010 incident, San José Police Officer Tri Pham, a certified Vietnamese language officer, interviewed defendant in Vietnamese while defendant was in custody. Officer Pham recorded the audio of the interview. The prosecutor played the recording for the jury and provided them with a transcript of an English translation.

Defendant said Mother had "set me up."[9] He said Mother had been living in his house for two years, and he wanted her to leave. At first she paid the rent on time, but one month she was short, and another month she paid late. Mother had a male friend living with her. Defendant complained that they used too much water and electricity. He asked her to leave, but she refused.

Defendant said he was lying on the couch watching television. B.T. wanted to watch television with him, but he did not want her to, so he tried to push her away. B.T. refused to leave. Mother heard what was happening, and came into the room to take B.T.

---

[9] All quotes from this interview are taken from the transcript of the English translation.

11

into their bedroom.  He denied that he put his hand under B.T.'s shirt.  He said he had pushed B.T. on her chest and buttocks while telling her, "child, go inside."  He said Mother took B.T. into her room and beat her.

Officer Pham told defendant that Mother said she had seen defendant's hand in B.T.'s pants.  Defendant responded, "I pushed and I caught the hand down here, not that I—I didn't—"  Defendant said he did not intentionally put his hand in B.T.'s pants.  He denied several times that he touched or put his finger or any other object in B.T.'s vagina.  He said he just put his hand in B.T.'s pants, and she "pushed out."  When Officer Pham asked defendant what he was thinking, he said "I was just playing with her."  He admitted that he touched her chest inside her shirt.

Officer Pham then asked defendant about the 2009 incident.  Defendant said that "no such thing happened" and that it was only "grandpa playing with the kid."  He said that after Mother saw the incident, she called her friend over, and defendant apologized.  Defendant again told Officer Pham that he was just playing with B.T.  He denied touching B.T.'s chest or putting his hand in her pants.  He said they were just "pushing back and forth."

E.  *B.T.'s Testimony*

B.T. testified in court three times: at the preliminary hearing in November 2010, at the first trial in July 2011, and at the second trial in April 2012.  Transcripts of her testimony in the first two appearances were read out loud to the jury in the April 2012 trial.

1.  *The 2010 Preliminary Hearing*

At the preliminary hearing, B.T. testified in Vietnamese through an interpreter, as follows:  In 2010, she went into the living room, where defendant was pretending to sleep on the couch while watching television.  B.T. sat on the armrest of the couch.  Defendant, using both hands, grabbed her hands and pulled her close to him.  Defendant had long nails, and they hurt B.T.  He unbuttoned her shirt, and touched her chest under her shirt.

12

He then touched her several times in "the place where you go pee-pee." B.T. felt defendant's hand going inside her body. He inserted all five fingers, hurting her. B.T. was scared, and tried to get away, but she could not. Defendant had one hand on her chest, and one hand on her vaginal area. He did not say anything to B.T. When Mother came in the room, defendant released her. B.T. did not know if defendant still had his hand in her pants when Mother came in. B.T. cried, and Mother took B.T. into her room. B.T. told her what happened, and Mother called the police.

B.T. also testified about the 2009 incident. She could not remember what month or what time of year it was, but she was in school at the time. There was a bed in the living room. Defendant pulled B.T. onto the bed and touched her breasts under her clothes. He also touched her under her clothes "where I usually go pee-pee." She was scared, and it hurt. She tried to get away from defendant, but he was holding her around her body, and he was too strong. Defendant told B.T. not to tell her Mother.

2. *The July 2011 Trial*

At the first trial, B.T. testified through a Vietnamese interpreter. At first, she could not recall the 2010 incident. She recalled being at home with her mother on the day the police were called, but B.T. could not recall most details of the events. In response to several leading questions, she recalled that defendant was lying on the couch when he grabbed her arm and pulled her towards him. She was scared at the time, but she could not recall what happened next. In response to further leading questions by the prosecutor, she testified that she was unable to get away because he was stronger and bigger than her. She could not remember what she was wearing or if she was wearing underwear. The prosecutor questioned her about her statement to police, and she testified that she was wearing underwear.

The prosecutor asked B.T. what happened after defendant pulled her towards him, but she could not recall. The prosecutor asked if defendant touched her body, and she responded yes, but she could not remember where on her body he touched her. She also

13

could not remember telling the police where defendant had touched her. The prosecutor asked if defendant touched her chest, and B.T. responded, "I would not know."[10] In response to further leading questions, B.T. testified that defendant touched her belly, and that his fingernails scratched her there, causing pain.

The prosecutor again asked B.T. if she remembered telling police that defendant had touched her on other parts of her body. She could not recall doing so. The prosecutor asked B.T. if defendant touched "the part of your body where you go pee-pee." She testified that he did, but she could not recall if defendant touched her inside her pants and underwear. She could not recall telling the police that defendant had touched her "where you go pee-pee." The prosecutor again asked B.T. if she could recall whether defendant touched her "where you go pee-pee," and she responded "No." The prosecutor asked B.T. if defendant put his finger "inside the hole on the part of the body where you go pee-pee," and B.T. responded that yes, she remembered that. She could not recall how many fingers he put inside her, and she could not recall testifying at the preliminary hearing that he put five fingers inside her. She testified that it hurt when defendant put his fingers inside her. She was scared, and she tried to get away, but she could not. B.T. could not recall testifying at the preliminary hearing that defendant was touching her chest while he had one hand inside her underwear. She could not recall if defendant "rubbed the top part of your pee-pee hole," or if she had told police that he did.

B.T. could not recall if she said anything to defendant, or if he said anything to her during the incident. At some point, Mother came into the living room. B.T. could not recall if defendant still had his hand in her pants and underwear at that point. Mother took B.T. into their bedroom. Defendant was "saying things that were not good," and calling Mother names. B.T. could not remember telling Mother that defendant touched her "in a place where you go pee-pee." Mother then called the police, and B.T. talked to

---

[10] All quotes of B.T.'s testimony in this section are taken from the transcript of the English translation of her testimony.

14

them.  On further questioning, B.T. could not recall when the incident happened, or whether it was last year or last summer.

The prosecutor then asked B.T. whether there was another time when defendant touched her inappropriately.  She could not recall, and she could not recall telling the police about another incident.  The prosecutor asked her repeatedly about her prior statements regarding the 2009 incident, but she could not recall them.  The prosecutor then asked, "[B.T.], as you are sitting here today, do you remember if there were two different times that this man touched you in your pee-pee area inappropriately?"  She could not recall.  The prosecutor asked if she recalled her prior testimony about the incident, and she repeatedly testified that she could not remember it.  The prosecutor asked her repeatedly about whether there was a second incident, and B.T. repeatedly testified that she could not recall it.

3.  *The April 2012 Trial*

At the second trial, B.T. testified in English as follows:  On the day police were called, she went into the living room and sat on the floor.  Defendant was sleeping, and she did not want to wake him.  Defendant, lying on the couch, grabbed her by the hand and pulled her onto the couch.  B.T. was scared, and she tried to grab onto a table to get away, but he kept pulling her, and he was too strong.  He held both her hands with both of his hands.  Defendant hugged B.T. and touched her on her chest under her shirt.  B.T. could not remember if he touched her anywhere else.  He put his hand inside her pants, but she was not sure if he put his hand inside her underwear.  She could not remember if he put his hand inside her vagina.  She could not remember if defendant said anything to her.  When Mother came into the room, he let her go.  Mother yelled, and they went into their room, where B.T. told her what happened.  Defendant had scratched B.T. on her stomach.

15

B.T. could not recall if there was another time when defendant touched her in a way that made her feel uncomfortable. She could not recall telling the police about another incident.

F. *Mother's Testimony*

Mother testified through a Vietnamese interpreter as follows: Mother called the police on July 24, 2010. Earlier that day, she was in her room peeling fruit for her daughter. She went into the living room to look for B.T. Defendant was lying on his back on the sofa. B.T. was sitting on defendant near his groin area. Defendant was holding both her hands crossed in front of her chest. B.T. was "shaking around," screaming, and crying. One of defendant's hands was inside her pants. Mother could not remember which hand it was. Defendant's hand was down B.T.'s pants up to the wrist, in the front of her pants. The back of the sofa blocked Mother's view.[11] Mother said, "What's happening?" and "What are you doing to my daughter?" Defendant released B.T., and she came to Mother. B.T. was crying, and they were both nervous. Defendant uttered profanities at them. B.T. told Mother that defendant had touched her vagina.[12] Mother took off B.T.'s clothes and saw a red scratch on her left, lower abdomen area. Mother looked at B.T.'s "privates" but did not see anything abnormal.

In 2009, B.T. told Mother that defendant touched B.T. inappropriately. Mother did not see this happen, but she believed B.T., so Mother tried to verify it. Mother instructed B.T. to tell her right away if it ever happened again. B.T. did not tell Mother in 2009 that defendant had touched her where she urinates.[13] Mother admitted she had

---

[11] On cross examination, Mother admitted that she had previously testified she could not be sure if defendant's hand was inside B.T.'s pants because the sofa was too high.

[12] This contradicted Officer Truong's account of Mother's statement to him, in which Mother said B.T. only told her defendant had touched B.T.'s chest and stomach.

[13] On further questioning, Mother testified she was not sure if B.T. told her in 2009 that defendant touched B.T. where she urinates.

previously testified there was only one touching incident. When she talked to the police in 2010, she told them "this type of thing" had never happened before.

Mother denied that she was ever late with rent payments to defendant. She admitted that she had a boyfriend who would stay overnight, but she denied having any disagreements with defendant about the matter. She could not recall if he ever asked her to move out.

G. *Expert Testimony*

Both parties introduced expert testimony concerning child sexual abuse accommodation syndrome. Carl Lewis, a former investigator and deputy sheriff, testified for the prosecution. He testified that the "syndrome is background information derived from clinical observation that is intended to assist the adult community in evaluating the often unexpected counterintuitive conditions that could up in come up in cases of child sexual abuse." The syndrome comprises five categories of unexpected or counterintuitive behavior that may be associated with molested children. As relevant here, one of the categories is retraction, in which an abused child denies that the abuse happened or minimizes the extent of it. Furthermore, Lewis opined that it is a myth that sexually abused children immediately report the incident and that they do so completely, revealing all the important details. He testified that it is common for children to be confused about what happened to them and that it is a myth that they are able to clearly and cogently report on their abuse. He added that it is not uncommon for children to give contradictory information about an incident and add different details or facts later. Additionally, Lewis testified that children who are called upon to talk about their abuse multiple times can experience frustration and fatigue, causing them to become reluctant to talk further.

Annette Ermshar, Ph.D., a clinical psychologist and forensic neuropsychologist, testified for defendant. Dr. Ermshar testified that, according to the researcher who developed child sexual abuse accommodation syndrome, the syndrome was a clinical

17

observation based on the researcher's opinions, not a scientifically established syndrome. She added that scientific studies of the syndrome showed that it has no scientific merit because it does not reliably distinguish sexually abused children from non-abused children. Rather, the syndrome is a model for advocacy, and it is not intended to be an investigative tool for determining the truth. As to the existence of a category of behavior labeled "retraction," Dr. Ermshar testified that it has been "absolutely refuted" by the scientific community. She testified that only four percent of children who were confirmed to have been abused actually recant, and that retraction is "completely inconsistent" with abuse.

## II. PROCEDURAL BACKGROUND

Defendant was first tried by jury on six counts in July 2011. For the 2009 incident, defendant faced one count of sexual penetration with a child aged 10 or younger (§ 288.7, subd. (b)), one count of a lewd or lascivious act on a child under 14 by force (§ 288, subd. (b)(1)), and one count of a lewd or lascivious act on a child under 14 (§ 288, subd. (a)). For the 2010 incident, he faced the same three charges. The trial court declared a mistrial after the jury hung on all counts. As to the charge of sexual penetration in 2010, eight jurors voted not guilty, and four voted guilty. As to each of the two charges of a lewd or lascivious act in 2010, seven jurors voted guilty, and five jurors voted not guilty. As to the charge of sexual penetration in 2009, nine jurors voted not guilty, and three jurors voted guilty. As to each of the two charges of a lewd or lascivious act in 2009, seven jurors voted not guilty, and five voted guilty.

In April 2012, the prosecutor filed a second amended information alleging four counts—two counts for each of the two incidents, as shown in the table below.

| Year | Count | Charge |
|------|-------|--------|
| 2010 | One | Sexual penetration of a child aged 10 or younger |
|      | Two | Lewd or lascivious act on a child under 14 by force |
| 2009 | Three | Sexual penetration of a child aged 10 or younger |
|      | Four | Lewd or lascivious act on a child under 14 by force |

Count One (sexual penetration of a child aged 10 or younger) and Count Two (lewd or lascivious act on a child under 14 by force) pertained to the 2010 incident. (§§ 288.7, subd. (b), 288, subd, (b)(1).) Count Three (sexual penetration of a child aged 10 or younger) and Count Four (lewd or lascivious act on a child under 14 by force) pertained to the 2009 incident. The second trial started April 10, 2012.

A. *Closing Arguments*

The parties gave closing arguments on April 19, 2012. In closing, the prosecutor summarized the evidence and set forth the four counts sequentially. He first stated that Counts One and Two "relate to July 24, 2010," and Counts Three and Four "relate to the 2009 event." He then stated, "For Counts 1 and 3, which are the sexual penetration charges, it's very clear that there is [*sic*] only two acts that could form the basis of those charges, that on or about July 24, 2010, the defendant stuck his hand inside B.T.'s underwear and put his finger inside her vagina, and that he did the same sometime in 2009. For Counts 2 and 4, there are four separate acts that could form the basis. Okay? One is that the defendant put his hand under B.T.'s shirt and touched her breasts with lewd intent. Or the touching of the vagina. If you believe that no penetration occurred, for example, but you agree that he touched the vagina in a lewd fashion, you could use that information to convict the defendant in Counts 2 and 4. So there is [*sic*] four separate acts that apply in Counts 2 and 4."

The prosecutor then referred to the forthcoming unanimity instruction. "I'm going to explain to you what I think you should do, *but you can take the facts and apply them to*

19

*any of the crimes* as long as you all agree what act you are talking about. You don't have to tell us what act you are all agreeing upon, just that that particular act was committed. But my theory of the case is as follows:" (Italics added.) He then described each count in turn again. He described the offense in Count One as occurring on July 24, 2010, and alleged defendant put his hand in B.T.'s underwear and his finger in her vagina. He argued that the offense in Count Two occurred just before that act, when defendant touched B.T.'s breasts.

The prosecutor then turned to Counts Three and Four. He said "Now we are talking about 2009. In 2009 he sticks his finger in her pants, in her underwear, and puts his finger inside her vagina. That's the sexual penetration in 2009. And then the lewd act is when similarly *in 2010* he holds her against her will and he touches her breast area with his hands." (Italics added.)

In summarizing his theory of the case, the prosecutor added, "So that's the easiest way and I think that's the most logical way that the case has been proved. But as I said, *you can apply the acts to the different crimes if you wish.* You just must all agree what act you are applying to each crime. But I think the easiest way is to just go in chronological order in the way that it was reported and the way that I have already explained." (Italics added.)

B. *Jury Instructions*

The court instructed the jury at the end of closing arguments. First, the court supplied jurors with papers copies of the instructions and told them they could voluntarily read along with her oral instructions. Jurors were also allowed to take the paper copies into deliberations. Each juror had his or her own copy.

In its first reference to the time span applicable to the charges, the court stated that Count One and Count Two alleged the offenses occurred "on or about July 24, 2010. The People are not required to prove that the crimes took place exactly on that day, but only that they happened reasonably close to that day."

20

Later, the court read through each of the four counts as set forth in the information. As to Counts One and Two, the court stated they were alleged to have occurred on or about July 24, 2010. As to Counts Three and Four, the court stated each was alleged to have occurred "on or about and between January 1, 2009, and December 31, 2009 [. . .]" With respect to Counts One and Three, the court provided the CALCRIM 250 instruction defining general intent, stating that "[the] person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it is not required that he or she intend to break the law." Subsequently, in defining sexual penetration, the court instructed the jury that "Sexual penetration means penetration, however slight, of the genital opening of the other person by any foreign object for the purpose of sexual abuse, arousal, or gratification. Penetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort."

After instructing jurors on the elements of the charged offenses, the court instructed them on lesser included offenses. First, the court instructed jurors that simple battery was a lesser included offense in all four counts.[14] (§ 243, subd (a).) For Counts Two and Four, the court instructed on the lesser included offense of lewd act on a child. (§ 288, subd. (a).) The court further instructed that it could not accept a guilty verdict on a lesser included offense unless the jury unanimously found the defendant not guilty of the greater offense.

Shortly thereafter, the court gave the following unanimity instruction pertaining to Counts Two and Four: "The defendant is charged with lewd or lascivious act upon a child under 14 and lewd or lascivious act by force or fear in Count 2 on or about July 24, 2010, *and in Count 4 sometime during the period of January 1, 2009, and December 31,*

---

[14] The record includes three verdict forms allowing for verdicts of simple battery on Counts One, Two, and Three, but there is no verdict form for simple battery on Count Four.

21

*2010.* The People have presented evidence of more than one act to prove that the defendant committed these offenses and the lesser included offenses. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed." (Italics added.)

After several more instructions, defense counsel informed the court of a correction, and a bench conference was held off the record. After the conference, the court told the jury, "I did misread something, so -- actually it was a typographical error. I will take responsibility for it. If you go back to the unanimity instruction, which is CALCRIM 3500, the way it should read is the defendant is charged with lewd or lascivious act upon a child under 14 by force or fear in Count 2 on or about July 24th, 2010, *and in Count 4 sometime during the period of January 1st, 2009, and December 31st, 2010.* So we are striking the language -- the repetition of the phrase 'and lewd or lascivious act.' I'm going to put that correction in the official set and that's going to be amended as filed. And if you need this, just let us know, and we will send it in to you." (Italics added.) Defense counsel lodged no objection at this point.

The written copy of the unanimity instructions provided to the jurors originally instructed, "The defendant is charged with lewd or lascivious act upon a child under 14 and lewd or lascivious act by force or fear in Count 2, on or about July 24, 2010, and in Count 4 *sometime during the period of January 1, 2009 and December 31, 2010.* The People have presented evidence of more than one act to prove that the defendant committed these offenses and the lesser included offenses. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed." (Italics added.) The phrase "and lewd or lascivious act by" was crossed out by hand.

22

C. *Verdicts and Sentencing*

The jury found defendant guilty as charged on Count One (sexual penetration with a child), Count Two (lewd or lascivious act on a child by force), and Count Four (lewd or lascivious act on a child by force). On Count Three, the jury found defendant not guilty of sexual penetration with a child, but found him guilty of the lesser included offense of simple battery.

The court imposed an indeterminate term of 15 years to life for Count One consecutive to a determinate term of 12 years, equal to two consecutive six-year terms for Counts Two and Four. For Count Three, the court imposed a six-month jail term to run concurrently with the prison terms; the court deemed it satisfied. The court gave defendant credit for 837 total days of time served.

### III.  DISCUSSION

Defendant contends the court made three errors in its jury instructions. First, defendant contends the court erroneously expanded the time period in which the jury could consider conduct forming the basis for Count Four. Second, defendant contends the court violated its sua sponte duty to instruct the jury on the lesser included offense of attempted sexual penetration of a child in Count One. Third, defendant argues the court erred by instructing the jury on general intent with respect to Count One.

A. *The Erroneous Unanimity Instruction Pertaining to Count Four*

The second amended information charged defendant in Count Four with committing a lewd or lascivious act on a child by force "On or about and between January 1, 2009, and December 31, 2009." However, in its unanimity instruction, the court instructed the jury that defendant was charged with committing that act "sometime during the period of January 1, 2009 and December 31, 2010." Defendant argues that by erroneously changing "2009" to "2010," the court violated his federal rights to due process and trial by jury. Defendant contends this error requires reversal.

23

The Attorney General concedes the instruction was erroneous, but argues defendant forfeited the claim by failing to object. The Attorney General further argues the error was harmless because there was no reasonable probability the jury could have applied the instruction so as to violate defendant's rights.

### 1. *Forfeiture*

The Attorney General cites to *People v. Catlin* (2001) 26 Cal.4th 81 (*Catlin*), overruled on another ground in *People v. Nelson* (2008) 43 Cal.4th 1242, for the proposition that defendant's failure to object to the erroneous instruction constitutes forfeiture. Catlin was convicted of two counts of murder and sentenced to death. The trial court, at the defendant's request, had modified an instruction on malice to exclude the definition of express malice. (*Id.* at p. 147.) But the trial court also gave the standard instruction on the definition of murder that included a reference to express malice. Our high court found any claim of error forfeited, holding " 'a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*Id.* at p. 149.) *Catlin* is inapposite. The unanimity instruction given by the trial court here was not "correct in law and responsive to the evidence." (*Cf. People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 [defendant's claim—that the instruction was not "correct in law," and that it violated his right to due process of law—was not of the type that must be preserved by objection].)

The applicable rule is that an appellate court may review "any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§§ 1259, 1469; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103, fn. 34.) "[W]hether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim . . . ." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

Accordingly, we will review the merits of defendants claim. Because we will conclude the error affected his substantial rights, we find his claim was not forfeited.

2. *Harmless Error Analysis*

Because the Attorney General does not dispute the existence of error, the central disagreement between the parties concerns the proper standard for harmless error analysis and the application of that standard.[15]

Defendant contends the instruction violated his federal constitutional rights under the Fifth and Sixth Amendments. Because the erroneous instruction on Count Four extended the end of the applicable time period from which the jury could consider acts of lewd or lascivious conduct from December 31, 2009 until December 31, 2010, the jury could have convicted him on Count Four based on the 2010 incident. Thus, the jury may have convicted defendant on Count Four without finding him guilty of the 2009 incident beyond a reasonable doubt—that is, without finding him guilty of the conduct alleged as the basis for Count Four in the second amended information. Defendant argues that this violated his federal due process rights under *Jackson v. Virginia* (1979) 443 U.S. 307, and his right to a jury's finding of guilt beyond a reasonable doubt under *In re Winship* (1970) 397 U.S. 358.

As a general matter, when a claim of error implicates a defendant's federal constitutional rights, we look to federal law for the harmless error standard. (See *Chapman v. California* (1967) 386 U.S. 18, 23-24 (*Chapman*).) Applying *Chapman*, defendant contends the error requires reversal unless the Attorney General can show beyond a reasonable doubt that the error did not contribute to the verdict. (See *People v. Jeter* (2005) 125 Cal.App.4th 1212, 1217 ["Conflicting instructions or instructions that misdescribe an element of an offense are harmless 'only "if it appears 'beyond a

---

[15] Defendant does not assert the erroneous instruction was "structural error" requiring reversal per se.

25

reasonable doubt that the error complained of did not contribute to the verdict obtained.' " ' "].)

The Attorney General, relying on *People v. Hughes* (2002) 27 Cal.4th 287 (*Hughes*), contends we must look to state law for the harmless error standard and reverse only if we find it reasonably likely the erroneous instruction confused or misled the jury. Hughes was charged with murder, robbery, burglary, and sodomy. His primary defense was that he was too intoxicated to form the requisite intent. (*Id.* at p. 330.) At Hughes' request, the trial court instructed the jury that voluntary intoxication was no defense to the sodomy charge, a general intent crime. (*Id.* at p. 340.) Regarding the specific intent crimes of murder, robbery and burglary, the trial court instructed the jury that it could consider voluntary intoxication in deciding whether the defendant had the required mental states.

On appeal, Hughes claimed the jury could have been confused by these diverging instructions. The California Supreme Court assumed, for the sake of argument, that the instructions were "potentially misleading." (*Hughes*, *supra*, 27 Cal.4th at p. 341.) The court then concluded that the instructions posed no "substantial risk of actually misleading the jury" into thinking that Hughes' voluntary intoxication evidence—the centerpiece of his defense—could not be considered with regard to the murder, robbery, and burglary charges. (*Ibid.*) The court noted that the two instructions specified the counts to which they applied. Furthermore, the parties' closing arguments emphasized the correct interpretation of both instructions. Considering these factors together, the court held it was not "reasonably 'likely the jury was "misled to defendant's prejudice" ' . . . ." (*Ibid.*)

The Attorney General also cites *Middleton v. McNeil* (2004) 541 U.S. 433 (*McNeil*), for the proposition that the proper harmless error standard is whether it is reasonably likely the jury was misled. McNeil was charged with murder for shooting her husband after an argument over his infidelity and spending habits. (*Id.* at p. 434.) She

claimed she killed her husband out of self-defense. The trial court properly instructed the jury on the doctrine of imperfect self-defense, under which a defendant acts out of an "honest *but unreasonable belief* in the necessity to defend oneself against imminent peril to life or great bodily injury." (*Ibid.*) (Italics added.) The trial court gave two more instructions properly defining imperfect self-defense as based on an "unreasonable belief" in the threat of imminent peril. The trial court then instructed the jury that an " 'imminent' peril is one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer *as a reasonable person.*" (*Id.* at p. 435.) (Italics added.) The trial court had erroneously added the phrase "as a reasonable person" to the instruction. The California Court of Appeal, in an unpublished opinion, ruled that it was not "reasonably likely that the jury would have misunderstood" the application of the doctrine, and affirmed McNeil's conviction. (*Id.* at p. 436.)

The United States Supreme Court considered McNeil's claim as part of her federal habeas corpus petition. As such, the high court applied the deferential standard of review mandated by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), under which a federal court determines whether the state court's application of federal law is " 'not only erroneous, but objectively unreasonable.' " (*McNeil*, *supra*, 541 U.S. at p. 436.) The high court observed that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' " (*Id.* at p. 437.) Furthermore, an instruction " ' "may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " [Citations.] If the charge as a whole is ambiguous, the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " " (*Ibid.*) The court concluded that "[g]iven three correct instructions and one contrary one, the state court did not unreasonably apply

27

federal law when it found that there was no reasonable likelihood the jury was misled." (*Id.* at p. 438.)

Defendant contends *Hughes* and *McNeil* do not apply here because the reasonable likelihood standard applies only where the jury instruction is ambiguous, not erroneous on its face. (*Wade v. Calderon* (9th Cir. 1994) 29 F.3d 1312, 1320-1321 [reasonable likelihood is the proper standard for determining the effect of an ambiguous instruction, but not where the instruction is unambiguous] [overruled on other grounds by *Rohan ex rel. Gates v. Woodford* (2003) 334 F.3d 803, 815]; *Ho v. Carey* (9th Cir. 2003) 332 F.3d 587, 592 [court is not required to use the "reasonable likelihood" standard when jury instruction is not merely ambiguous, but flatly erroneous].)

The United States Supreme Court set forth the reasonable likelihood standard in *Boyde v. California* (1990) 494 U.S. 370. There, the high court surveyed its previously disparate treatment of erroneous jury instructions. (*Id.* at pp. 378-380.) First, the court distinguished those cases wherein "a jury is clearly instructed by the court that it may convict a defendant on an impermissible legal theory, as well as on a proper theory or theories. Although it is possible that the guilty verdict may have had a proper basis, 'it is equally likely that the verdict . . . rested on an unconstitutional ground,' [citation], and we have declined to choose between two such likely possibilities." (*Id.* at p. 380.) By contrast, the court observed that in the case before it, "we are presented with a single jury instruction. The instruction is not concededly erroneous [. . . .] [Citations.] The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry *in such a case* is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." (Italics added.) The court in *Boyde* thereby limited the reasonable likelihood standard to cases involving a single ambiguous instruction.

*Hughes* and *McNeil* do not hold otherwise. In *Hughes,* our high court applied the reasonable likelihood standard in the context of two legally correct instructions that

28

arguably could have been ambiguous. (*Hughes*, *supra*, 27 Cal.4th at p. 341.) The language of the instructions properly limited their application to the respective counts, and the instructions were not in conflict. The court's application of the reasonable likelihood standard therefore conformed to the analysis in *Boyde*. In *McNeil*, the United States Supreme Court considered a state court's application of the reasonable likelihood standard in the context of one jury instruction that ran contrary to three correct instructions. (*McNeil*, *supra*, 541 U.S. at p. 438.) The court in *McNeil*, analyzing the state court's ruling under the deferential AEDPA standard, held only that the ruling was not an "objectively unreasonable" application of the reasonable likelihood standard. (*Ibid.*) The court did *not* hold that the reasonable likelihood standard applies when an instruction is legally erroneous on its face.

Here, the jury was given two starkly conflicting instructions, one of which was erroneous on its face. In describing Count Four, when reading from the information, the trial court identified the offense as occurring "on or about and between January 1, 2009, and December 31, 2009 . . . ." Shortly thereafter, the court erroneously instructed the jury that it could consider conduct that occurred through December 31, *2010*, to convict defendant on Count Four. This error was repeated again in written instructions that were given to each juror. This erroneous instruction cannot be described as "ambiguous"; it is clearly and concededly erroneous on its face. While the instructions taken as a whole contained some ambiguity, in that a jury could choose among two competing instructions, it is more precise to say the instructions were in direct conflict. The jury was "clearly instructed by the court that it may convict a defendant on an impermissible legal theory, as well as on a proper theory or theories." (*Boyde*, *supra*, 494 U.S. at p. 380.) Thus, "[a]lthough it is possible that the guilty verdict may have had a proper basis, 'it is equally likely that the verdict . . . rested on an unconstitutional ground,' . . . ." (*Ibid.*) As *Boyde* instructs, we should "decline[] to choose between two such likely possibilities." (*Ibid.*) Because the verdict here could have rested on an unconstitutional ground, in violation of

29

defendant's federal constitutional rights, the erroneous instruction requires reversal unless the Attorney General can show beyond a reasonable doubt that the error did not contribute to the verdict.

The Attorney General identifies nothing in the record to suggest the jury ignored the erroneous instruction or otherwise applied it correctly. The jury asked no questions about the instruction or related matters. Nobody interviewed the jurors or presented other evidence of how they interpreted the instruction. The court said nothing to suggest that one instruction should be given priority over the other. Nothing "in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other." (*Francis v. Franklin* (1985) 471 U.S. 307, 322.) On this record, the Attorney General has not shown harmless error.

Even under the Attorney General's proposed standard, in which reversal is required only if it is reasonably likely the erroneous instruction confused or misled the jury, we find a reasonable likelihood that the jury was misled and defendant was harmed. First, the jury was exposed to the error in several ways. Before charging the jury, the court gave paper copies of the erroneous instruction to each juror, and the court encouraged jurors to read along with her oral instructions. Then, because of an unrelated error, the court read the erroneous instruction to the jury *twice*. Jurors were also allowed to keep their paper copies for deliberations. The jury thereby had multiple opportunities to be misled by the erroneous instruction.

Second, the prosecutor's closing argument exacerbated the potential effect of the error. In summarizing Count Four, he—like the court—misstated the applicable time period, arguing that "the lewd act is when similarly *in 2010* he holds her against her will and he touches her breast area with his hands." (Italics added.) He also described the import of the unanimity instruction in an ambiguous fashion, arguing that "you can take the facts and apply them to any of the crimes as long as you all agree what act you are talking about," and "you can apply the acts to the different crimes if you wish . . . ."

30

These arguments failed to clarify that the jury could only consider acts committed in 2009 with respect to offenses alleged to have occurred in 2009. To the contrary, taking the prosecutor's statements literally, the jury was encouraged to do exactly what should have been prohibited. In concert with the court's erroneous instruction, the prosecutor's arguments increased the likelihood the jury would convict defendant on Count Four based on conduct that occurred in 2010, instead of 2009 as alleged in the second amended information.[16]

Third, the state of the evidence increased the likelihood the jury convicted defendant on Count Four absent a finding beyond a reasonable doubt that he committed the 2009 offense. In her preliminary hearing testimony, Mother had testified that there was only one incident. At the first trial, B.T. repeatedly testified that she did not recall any incident in 2009, despite repeated leading questions from the prosecutor. And at the second trial, B.T. could not recall whether the incident in 2009 happened at all.

B.T.'s prior statements to police were also contradictory. When Officer O'Neil first interviewed B.T., immediately following the incident on July 24, 2010, B.T. initially said nothing about defendant touching her vaginal area in 2009. It was only after further prompting by Officer O'Neil that B.T., by waving her hands, indicated defendant touched her vaginal area in 2009. B.T. also told Officer O'Neil that Mother witnessed the incident in 2009, but Mother testified that she did not. Similarly, Mother told police in 2010 that "this type of thing" had never happened before.

On further questioning about the 2009 incident by Officer Truong, B.T. stated that defendant put his entire hand inside her vagina. The jury must have discredited this statement, as it acquitted defendant on Count Three—sexual penetration alleged to have occurred in 2009—which was not subject to the unanimity instruction. It is reasonably likely the jury discredited other statements made by the victim about the 2009 incident.

---

[16] We do not believe the prosecutor had any intention to confuse or mislead the jury in this regard; indeed, the court had not yet given the erroneous instruction.

31

Thus, it is reasonably probable the jury harbored a reasonable doubt about whether the defendant committed a lewd or lascivious act on the victim *in 2009*, while convicting him on the basis of the 2010 conduct instead.

The Attorney General contends there is no reasonable probability the jury applied the wrong evidence to Count Four because the evidence clearly identified two separate incidents—one in 2009, and one in 2010. The Attorney General is correct that "this is not a case where the jury could have been confused or misled about when the first event occurred." But that argument misses the import of the error. The problem is not that the jury may have thought the 2010 incident happened in 2009; the problem is that the erroneous instruction allowed them to *misapply* the facts of the 2010 incident to Count Four.[17]

On balance, given the circumstances surrounding the erroneous instruction—the multiple ways in which the jury was exposed to it, the confusing and ambiguous nature of the prosecutor's arguments on the unanimity instruction, the state of the evidence for Count Four, and the jury's acquittal on Count Three—we find a reasonable likelihood that the jury was misled and defendant was harmed by the error. Accordingly, we conclude defendant suffered prejudice regardless of which standard we use to assess harmless error, and we will reverse the conviction on Count Four.

We do not do so lightly. A jury's verdict, as "the collective judgment of the community," deserves deference. (*United States v. Powell* (1984) 469 U.S. 57, 67.) But this presumes the verdict comes from a jury that is properly instructed; that is not the case here.

B. *Failure to Instruct on a Lesser Included Offense in Count One*

Defendant also contends the trial court erred by failing to instruct the jury on attempted sexual penetration as a lesser included offense to Count One, the sexual

---

[17] We note that the verdict forms contained no reference to the applicable time periods.

penetration alleged to have occurred in 2010. The Attorney General concedes that attempted sexual penetration is a lesser included offense of sexual penetration. But the Attorney General argues the trial court had no sua sponte duty to instruct the jury on attempt because it was not supported by substantial evidence. The Attorney General alternatively argues that even if the court had a duty to instruct on attempt, the error was harmless because there was no reasonable likelihood the jury would have acquitted defendant on Count One as charged. For the reasons below, we find the court erred by failing to instruct the jury on attempted sexual penetration with respect to Count One.

1. *Standard of Review*

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.] A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, ' "that is, evidence that a reasonable jury could find persuasive" ' [citation], which, if accepted, ' "would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*' [citations]." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

2. *Duty to Instruct on Attempted Sexual Penetration as a Lesser Included Offense*

"The jury, or the judge if a jury trial is waived, may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." (§ 1159.) "Thus, where there is evidence that would absolve the defendant from guilt of the charged offense but would support a finding of guilt of attempt to commit the charged offense, an instruction on attempt is mandatory." (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1454.)

As a general matter, an attempt to commit a crime is a lesser included offense of the completed crime. "[T]here is no reason in the nature of things why a defendant may not be guilty of an attempt to commit a crime without being guilty of the crime attempted to be perpetrated. It is not disputed, nor could it well be disputed, that, as an abstract proposition, every completed crime necessarily involves an attempt to commit it."

(*People v. Vanderbilt* (1926) 199 Cal. 461, 463; see also *In re Sylvester C.* (2006) 137 Cal.App.4th 601, 609 ["attempt is a lesser included offense of any completed crime"]; *People v. Meyer* (1985) 169 Cal.App.3d 496, 506 ["every substantive criminal offense necessarily includes the attempt to commit it"].)

This principle is consistent with the "elements test" for whether an offense is a lesser included offense of another crime. Under the elements test, an uncharged offense is included in a greater charged offense if the statutory elements of the greater offense include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. (*People v. Birks* (1998) 19 Cal.4th 108, 117-118.) Thus, where an attempt to commit an offense may be distinguished from the substantive offense solely by the failure to complete the actus reus, the elements of the attempted offense are all included in the greater offense.

However, " '[t]he law of "attempt" is complex and fraught with intricacies and doctrinal divergences.' " (*People v. Bailey* (2012) 54 Cal.4th 740, 753 [quoting *Moorman v. Thalacker* (8th Cir. 1996) 83 F.3d 970, 974].) One such divergence arose in 1986 when the Legislature enacted section 21a, providing, "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." As a consequence, when the completed offense is a general intent crime, an attempt to commit that offense does not meet the definition of a lesser included offense under the elements test because the attempted offense includes a specific intent element not included in the complete offense.[18] (*People v. Strunk* (1995) 31 Cal.App.4th 265, 271 ["an attempt is a specific intent crime and does

---

[18] However, this does not mean a general intent crime can never include the attempted offense as a lesser included. (See *People v. Atkins* (2001) 25 Cal.4th 76, 88 ["attempted rape, a specific intent crime, is a lesser included offense of rape, a general intent crime"]; *People v. Martinez* (1999) 20 Cal.4th 225, 241 [kidnapping reduced to attempted kidnapping]; *People v. Kelly* (1992) 1 Cal.4th 495, 528 [rape reduced to attempted rape].)

not fit within the definition of a necessarily included offense of a general intent crime"]; *People v. Bailey*, *supra*, 54 Cal.4th at p. 749.)

Here, however, the parties agree—as do we—that sexual penetration with a child is a specific intent crime under section 288.7, subdivision (b). That statute incorporates the definition of "sexual penetration" set forth in section 289. " 'Sexual penetration' is the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening *for the purpose of sexual arousal, gratification, or abuse* by any foreign object, substance, instrument, or device, or by any unknown object." (§ 289, subd. (k)(1).) (Italics added.) The italicized language specifies the level of intent required for sexual penetration under section 289. (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1538 [sexual penetration by force is a specific intent crime under section 289]; *People v. Senior* (1992) 3 Cal.App.4th 765, 776 ["specific intent involved in foreign object penetration is 'the purpose of sexual arousal, gratification, or abuse' "].) Section 21a does not add a specific intent element not already included under the definition of the completed offense. Accordingly, the attempted crime is distinguished from the completed crime only by the failure to complete the actus reus, and the attempted offense is a lesser included offense under the elements test.

The Attorney General nonetheless argues the trial court had no duty to instruct on the attempted offense because the evidence did not support it. We disagree. In her initial statements to police, B.T. was consistent in stating that defendant touched her during the 2010 incident, but she was equivocal as to whether defendant actually penetrated her. In Mother's statements to police and in her trial testimony, she stated that she interrupted defendant's touching of B.T. when she walked into the living room. Mother testified that she saw defendant's hand in B.T.'s pants, but she did not see whether defendant penetrated B.T. Mother told police she did not believe defendant had penetrated B.T. Defendant admitted touching B.T., as corroborated by the scratch on her stomach, but he

35

consistently denied that he penetrated her. This evidence is consistent with the possibility that defendant attempted to penetrate B.T., but that Mother interrupted the attempt when she walked into the room. We find this constitutes "evidence that a reasonable jury could find persuasive" as to attempted sexual penetration. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1218.) Therefore, the trial court had a sua sponte duty to instruct the jury accordingly, and it erred in failing to do so.[19]

### 3. *Prejudice to Defendant From the Failure to Instruct on Attempt*

The Attorney General contends defendant cannot show he was prejudiced under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) because there was no reasonable likelihood of a more favorable outcome in the absence of error. Defendant, asserting the error violated his federal constitutional rights, contends the proper standard for assessing harmless error is found in *Chapman*, requiring reversal unless the error is shown to be harmless beyond a reasonable doubt.

The Attorney General sets forth the correct standard. "[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility. We further determine, in line with recent authority, that such misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome."[20] (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) Defendant cites *People v. Huggins* (2006) 38 Cal.4th 175, for the proposition that

---

[19] Because the court had a sua sponte duty to issue the instruction, we need not consider defendant's failure to object on this point.

[20] In *People v. Thomas* (2013) 218 Cal.App.4th 630, the First District Court of Appeal recently held a failure to instruct on heat of passion in a murder trial—an instruction that would have allowed for a conviction of voluntary manslaughter as a lesser included offense—requires harmless error analysis under *Chapman*. (*Id.* at pp. 641-642.) However, the court based its reasoning on the observation that when provocation is put at issue, proof of malice requires the prosecution to prove the absence of provocation. (*Id.* at p. 643.) That reasoning does not apply here.

defendants have a constitutional right to instruction on a lesser included offense supported by substantial evidence. The court does so hold in *Huggins*, but as noted in *Breverman*, there is no authority for the proposition that a defendant has a *federal* constitutional right to such an instruction. (*Breverman*, *supra*, at p. 165.) To the contrary, "the United States Supreme Court has expressly refrained from recognizing a federal constitutional right to instructions on lesser included offenses in noncapital cases." (*Ibid.*) As such, we apply the *Watson* standard and consider whether it is reasonably likely defendant would have enjoyed a more favorable outcome in the absence of error.

We conclude defendant suffered prejudice from the failure to instruct the jury on the lesser included offense of attempted sexual penetration in 2010. Because of the relative weakness of the evidence showing defendant actually penetrated B.T., it is reasonably probable the jury would have voted instead to convict defendant for attempting to do so if the court had allowed that verdict. The jury was shown no physical evidence of penetration because the police declined to request a physical examination of B.T. Mother also told police she did not believe B.T. had been penetrated. The only evidence of penetration came from the victim, and her statements were contradictory as to whether defendant penetrated her.

When Officer O'Neil conducted the initial interview, B.T. indicated twice that defendant did not penetrate her or touch her vaginal area. Motioning with her hands, B.T. first indicated that defendant touched her breast area. Officer O'Neil asked B.T. if defendant touched her anywhere else, B.T. responded, "Um, no, just there." Officer O'Neil then instructed B.T. to touch herself where defendant touched her, and B.T. indicated defendant touched her on the breasts and the belly. Officer O'Neil again asked B.T. if defendant touched her anywhere else, and B.T. responded, "No, that's where he touched."

Later in the interview, Officer O'Neil pointed to her own vaginal area, and asked B.T. if defendant touched here "down in this area." B.T. then responded affirmatively, and in response to further questioning, B.T. said defendant's hand went under her underwear and touched her skin. Later in the interview, B.T. told Officer O'Neil that defendant put his fingers inside the "area where you go pee," but the record does not establish whether B.T. was referring to the 2009 incident or the 2010 incident. Officer O'Neil concluded, "I was unable to determine whether or not Ngo actually penetrated her vaginal opening with his fingers." Because Officer O'Neil, a witness for the prosecution, was the first law enforcement official to interview B.T., it is reasonably likely a jury would have credited Officer O'Neil's initial conclusion on the matter. Her later testimony, stating her belief that B.T. had been penetrated, contradicted her initial conclusion, so the jury reasonably may have found it less credible.

Officer Truong's interview, conducted in Vietnamese, also failed to evoke any clear statement from B.T. indicating defendant penetrated her. B.T. indicated that defendant touched her vaginal area, but she stated defendant touched her "above the hole," and used his whole hand. When Officer Truong asked B.T. if defendant put his hand inside her or just caressed her, B.T. said "He just caressed," and she indicated that he moved his hand side to side. Officer Truong again tried to determine whether defendant penetrated B.T., and asked whether he "put his finger into the hole that you urinate with." B.T. said he did not. Based on the interview, Officer Truong told Officer O'Neil there had been no vaginal penetration. Like Officer O'Neil, Officer Truong was a prosecution witness, and one of the first law enforcement officers to interview the victim—this time in Vietnamese. It is reasonably likely a jury would have found his initial conclusion persuasive.

At the preliminary hearing in 2010, B.T. testified that defendant touched her several times in "the place where you go pee-pee" and that she felt his hand go inside her body during the 2010 incident. She further testified that he put all five fingers inside her.

However, at the first trial in 2011, she repeatedly testified that she could not recall the details of the incident. She testified that she could not recall if defendant touched her inside her underwear, and she did not recall telling police that had happened. On further questioning, she testified that defendant put his finger "inside the hole on the part of the body where you go pee-pee," but she did not recall how many fingers he put inside her, and she could not recall her prior testimony that he used five fingers. At the second trial in 2012, she testified that defendant touched her on her chest, under her shirt, but she was not sure if he put his hand into her underwear. She could not remember whether defendant put his hand inside her. Based on the inconsistencies in this testimony, we think it is reasonably likely a jury would have formed reasonable doubt about whether defendant penetrated B.T.

The Attorney General notes that the trial court instructed the jury on the lesser included offense of simple battery. Furthermore, the court also instructed the jury that it could not convict defendant of a lesser included offense without unanimously finding him not guilty of the charged offense. Having been so instructed, the jury convicted defendant of the sexual penetration offense as charged in Count One, not the lesser included offense of simple battery. On this basis, the Attorney General contends the jury would not have rejected the charged offense in favor of a conviction for attempted penetration.

Defendant argues that forcing the jury to decide between the charged offense and simple battery, with no option for the middle-road option of attempted penetration, presented jurors with an "all or nothing" choice. (*People v. Barton* (1995) 12 Cal.4th 186, 196 [error to withhold instruction on lesser included offense because it would force the jury to make an "all or nothing" choice between conviction of the crime charged or complete acquittal].) We find this contention persuasive. Otherwise, by the Attorney General's logic, it would be impossible for a defendant to establish prejudice from failure to instruct on a lesser included offense in any case where the court provided

another alternative, no matter how slight.  It is reasonably probable the jury concluded defendant touched the victim's genital area in some manner, and that they opted for the more serious offense of sexual penetration because the only other options were a simple battery conviction or outright acquittal.

The dissent acknowledges the weakness of the evidence as to the completed offense in Count One, and the dissent agrees that the trial court erred in failing to instruct on the lesser included offense of attempted penetration.  Nonetheless, the dissent contends the error was harmless because the jury, given the option of finding defendant guilty of the lesser included offense of simple battery, was not faced with an "all or nothing" choice.  We conclude that here, where the only other lesser included option was a conviction for simple battery, the jury was still faced with the equivalent of an "all or nothing" choice.  The test for prejudice in this instance is still whether it is reasonably likely that a properly instructed jury would have reached a more favorable outcome.  This analysis is especially appropriate here, where the evidence was more consistent with attempted penetration than with the completed offense.

For these reasons, we find it is reasonably probable the jury, had it been instructed on attempt, would have convicted defendant of attempted sexual penetration in lieu of the completed offense.  Accordingly, we will reverse the conviction on Count One.  Pursuant to our power under section 1260, we will give the prosecution the option of retrying defendant on Count One, or accepting a reduction to attempted sexual penetration. (*People v. Edwards* (1985) 39 Cal.3d 107, 118.)

40

C. *The Erroneous General Intent Instruction on Count One*[21]

Above, we hold that sexual penetration of a child under 10 is a specific intent crime, requiring the jury to find the defendant penetrated the victim "for the purpose of sexual arousal, gratification, or abuse." (§ 289, subd. (k)(1); *People v. McCoy*, *supra*, 215 Cal.App.4th at p. 1538.) The trial court properly included this language when instructing the jury on the definition of penetration for Count One, but the court also instructed the jury using CALCRIM No. 250, a general intent instruction. Defendant, applying harmless error analysis under the *Chapman* standard, contends the error was prejudicial and requires reversal. The Attorney General agrees that the offense requires proof of specific intent but argues that, when viewing the instructions as a whole, the court properly instructed the jury. Furthermore, the Attorney General contends the claim is forfeited because defendant failed to object.

We conclude defendant's claim is not forfeited. A trial court has a sua sponte duty to instruct a jury on specific intent when the offense requires it. (*People v. Alvarez* (1996) 14 Cal.4th 155, 220.) Furthermore, we find the court erred in instructing the jury on general intent with respect to Count One. As the Judicial Council's bench notes state with respect to CALCRIM No. 250, "this instruction **must not** be used if the crime requires a specific mental state, such as knowledge or malice, even if the crime is classified as a general intent offense. In such cases, the court must give CALCRIM No. 251, *Union of Act and Intent: Specific Intent or Mental State*." Similarly, the Judicial Council bench notes for CALCRIM No. 251 state "This instruction **must** be given if the crime requires a specific mental state, such as knowledge or malice . . . ." While the trial

---

[21] Although we are granting relief on Count One for the failure to instruct on the lesser included offense, our relief gives the prosecutor the option of accepting a conviction for the attempted offense. But a finding that the jury was erroneously instructed on intent could infect a conviction for the attempted offense as well, since the required level of intent is the same for the attempt and the completed offense. Therefore, we must still consider this claim of error, notwithstanding the above grant of relief.

court properly instructed the jury with CALCRIM No. 251 with respect to Counts Two and Four, the court never gave CALCRIM No. 251 with respect to Count One. Instead, the trial court gave CALCRIM No. 1128, which defines sexual penetration as doing so "for the purpose of sexual arousal, gratification, or abuse," thereby setting forth the required specific intent. Abuse was defined by the court as "causing pain, injury, or discomfort."

Thus, the trial court ultimately instructed the jury that it must find defendant committed the sexual penetration for the required purposes. This suggests the proper standard for harmless error analysis is the state court standard for prejudice set forth in *Watson*. The error here was more akin to the instructional errors in *Hughes*, *supra*, 27 Cal.4th 287, and *McNeil*, *supra*, 541 U.S. 433, discussed above in Section III.A.2. With CALCRIM No. 250, the trial court here instructed the jury, "A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it is not required that he or she intend to break the law." This instruction does not explicitly tell the jury that *no additional level of intent is required* for a conviction on Count One. Then, when instructing the jury as to the definition of sexual penetration, the trial court gave the language properly specifying the required intent. The jury reasonably could have interpreted these instructions as requiring it to find *both* types of intent. In contrast to the erroneous unanimity instruction analyzed above, the court did not give the jury two directly *conflicting* instructions. Rather, it is more accurate to describe the two instructions, when taken as a whole, as somewhat "ambiguous and therefore subject to an erroneous interpretation." (*Boyde*, *supra*, 494 U.S. at p. 380.) The "reasonable likelihood" standard is generally the proper standard with respect to such instructions. (*Ibid.*)

Regardless, we need not decide on the proper standard to resolve this claim. Even under the *Chapman* standard—which requires a showing that the error was harmless beyond a reasonable doubt—we would find no prejudice. Under either standard,

42

prejudice only arises where there is *some* possibility of a more favorable outcome. The record does not support any such possibility here. To convict defendant on Count One, the jury must have found beyond a reasonable doubt that he at least harbored the intent to commit the actus reus of penetrating the victim.[22] A more favorable outcome could only arise if a properly instructed juror could have found reasonable doubt that defendant penetrated the victim "for the purpose of sexual arousal, gratification, or abuse." There are very few circumstances in which a person would intentionally penetrate another person *without* such a purpose. Perhaps, for example, a father could penetrate his daughter when physically examining her for medical reasons. Or a defendant could be mentally unable to form the specific intent for some reason, e.g., mental illness. Whatever the possibility of such scenarios, nothing in the record would support them here. The evidence supports no plausible explanation for why the defendant would have intentionally penetrated the victim unless he did so for purposes of sexual arousal, gratification, or abuse. Accordingly, we conclude the error was harmless.

D. *Cumulative Prejudice*

Because the court committed three distinct instructional errors, we consider the possibility of cumulative prejudice. We found there was no possibility of a more favorable outcome as to the instructional error on the level of intent required for Count One. Thus, this error contributes nothing to the cumulative prejudice analysis. As to the other two instructional errors, they concern different counts and two analytically independent issues. These two errors therefore do not have any cumulative effect. (*People v. Rogers* (2006) 39 Cal.4th 826, 890 [no cumulative effect from independent errors].) Furthermore, we are already granting relief with respect to each of those errors. Accordingly, we find no cumulative prejudice.

_____

[22] This would also be true if the jury had been allowed to convict him of attempted sexual penetration, since the attempted offense includes the intent to commit the completed offense. (§ 21a.)

43

## IV.  DISPOSITION

The judgment is reversed, and the matter is remanded for possible retrial on Counts One and Four.  If the prosecution elects not to retry defendant on Count One, within 60 days after the filing of remittitur pursuant to Penal Code section 1382, subdivision 2, the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of attempted sexual penetration of a child under 10 under section 288.7, subdivision (b).  If the prosecution elects not to retry defendant, or at the conclusion of retrial, the trial court shall resentence defendant.


_____
Márquez, J.



I CONCUR:




_____
Grover, J.

BAMATTRE-MANOUKIAN, J., Concurring and Dissenting

Defendant was charged with committing sexual penetration of a child (count 1; Pen. Code, § 288.7, subd. (b)[1]) and a forcible lewd act on a child (count 2; § 288, subd. (b)(1)) on July 24, 2010. He was also charged with committing sexual penetration of a child (count 3; § 288.7, subd. (b)) and a forcible lewd act on a child (count 4; § 288, subd. (b)(1)) between January 1, 2009 and December 31, 2009. The jury convicted defendant as charged in counts 1, 2, and 4. As to count 3, the jury found defendant guilty of misdemeanor battery (§§ 242/243, subd. (a)).

On appeal, defendant contends count 4 must be reversed because the trial court erroneously instructed the jury it could convict him based on his commission of a lewd act between January 1, 2009 and December 31, 2010. Defendant contends count 1 must be reversed because the trial court failed to instruct the jury on attempted sexual penetration (§§ 664/288.7, subd. (b)) as a lesser included offense and because the trial court gave a general intent instruction as to that count. Finally, defendant contends the two instructional errors as to count 1 were cumulatively prejudicial.

For the reasons stated below, I agree with the majority that defendant's conviction in count 4 (§ 288, subd. (b)(1)) must be reversed, but I would affirm defendant's conviction in count 1 (§ 288.7, subd. (b)).

A.      *Count 4 – Unanimity Instruction Error*

In count 4, defendant was charged with committing a forcible lewd act between January 1, 2009 and December 31, 2009. However, the trial court twice read the jury a unanimity instruction that told the jury it could convict defendant of count 4 if it found he committed a forcible lewd act "sometime during the period of January 1, 2009, and December 31, 2010."

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Defendant contends that, because of the erroneous dates in the unanimity instruction, the jury may have convicted him of count 4 based on an act he committed outside of the charged time period—i.e., based on an act he committed in 2010 rather than an act he committed in 2009. He contends that this was a violation of his due process rights. (See *People v. Dominguez* (2008) 166 Cal.App.4th 858, 866 [instruction that extended the date range within which the crime was alleged to have occurred violated due process].)

An erroneous instruction violates a defendant's due process rights if there is a " ' "reasonable likelihood that the jury . . . applied the challenged instruction in a way" that violates the Constitution.' " (*Middleton v. McNeil* (2004) 541 U.S. 433, 437 (*Middleton*).) I agree with the majority and I would conclude that in this case, there is a reasonable likelihood that the jury relied on the incorrect unanimity instruction to find defendant guilty of count 4 based on an act he committed in 2010.

The trial court correctly instructed the jury that count 4 was alleged to have been committed between January 1, 2009 and December 31, 2009 when it read the second amended information, which was given to the jury in the written instructions. However, the court subsequently told the jury that count 4 was alleged to have been committed between January 1, 2009, and December 31, *2010*. In reading the unanimity instruction (CALCRIM No. 3500), the trial court stated: "The defendant is charged with lewd or lascivious act upon a child under 14 and lewd or lascivious act by force or fear in Count 2 on or about July 24, 2010, *and in Count 4 sometime during the period of January 1, 2009, and December 31, 2010*. [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses and the lesser included offenses. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed." (Emphasis added.)

2

Just before the jury retired to deliberate, the trial court read the incorrect unanimity instruction a second time. The trial court told the jury that it had "misread something" due to a "typographical error." The trial court told the jury to "go back to the unanimity instruction" and that "the way it should read is the defendant is charged with lewd or lascivious act upon a child under 14 by force or fear in Count 2 on or about July 24th, 2010, *and in Count 4 sometime during the period of January 1st, 2009, and December 31st, 2010.*" (Emphasis added.) The trial court specified that it was striking the repeated phrase " 'and lewd or lascivious act.' "

The written unanimity instruction was provided to the jury. It also incorrectly stated that in count 4, defendant was charged with committing a lewd or lascivious act "sometime during the period of January 1, 2009 and December 31, 2010."

The instructional error was compounded by the prosecutor's argument to the jury. Although the prosecutor stated the proper date range for each count at the beginning of his argument, he later stated that defendant committed the lewd act charged in count 4 "when similarly in 2010 he holds her against her will and he touches her breast area with his hands." The prosecutor also correctly told the jury that there were "four separate acts that could form the basis" for counts 2 and 4, referring to the touching of the victim's breasts in 2009, the touching of the victim's breasts in 2010, the touching of the victim's vagina in 2009, and the touching of the victim's vagina in 2010.

Thus, the trial court orally instructed the jury twice that count 4 could be based on an act committed in 2010, the jury was given a written instruction that said count 4 could be based on an act committed in 2010, and the prosecutor told the jury that count 4 could be based on an act committed in 2010. Under these circumstances, I would conclude there is a reasonable likelihood that the jury believed it could convict defendant of count 4 based on an act he committed in 2010, and thus that the instructional error violated defendant's due process rights. (See *Middleton, supra,* 541 U.S. at p. 437.)

3

Because the instructional error in this case amounted to a violation of due process, it is reviewed under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Here, as noted, the incorrect instruction was given twice, and the error was compounded when the prosecutor referred to 2010 when discussing count 4. Further, the evidence of the 2009 incident was weaker than the evidence of the 2010 incident, since the victim could not recall the 2009 incident when she testified at trial, and since the 2010 incident was witnessed by the victim's mother. Additionally, the instructions did not inform the jury that the unanimity instruction carried less weight than the second amended information. (See *Francis v. Franklin* (1985) 471 U.S. 307, 322.) On this record, I cannot conclude that the instructional error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24.)

### B.     Count 1 – Failure to Instruct on Attempted Penetration

Defendant contends the trial court erred by failing to instruct on the lesser included offense of attempted sexual penetration of a child (§§ 664/288.7, subd. (b)) as to count 1, in which he was charged with committing sexual penetration of a child (§ 288.7, subd. (b)) in 2010.[2] The majority concludes that the trial court had a sua sponte duty to instruct the jury on attempted sexual penetration because the victim was equivocal about whether penetration occurred; the majority also finds the error was prejudicial.

Assuming that the trial court had a sua sponte duty to instruct on attempted sexual penetration as to count 1, I would find the error harmless. As to both of the sexual penetration charges—count 1 and count 3—the jury was given the option of convicting defendant of battery (§§ 242/243, subd. (a)) if it did not believe, beyond a reasonable doubt, that defendant penetrated the victim. As to count 3 (the 2009 incident), the jury

---

[2] Section 288.7, subdivision (b) provides: "Any person 18 years of age or older who engages in . . . sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life."

did choose the lesser alternative, convicting defendant of battery rather than sexual penetration. The jury had the same option as to count 1 if it had a reasonable doubt as to whether there was penetration during the 2010 incident. Because it did not choose that option as to count 1, the trial court's failure to instruct on attempted penetration was not prejudicial.

An error in failing to instruct on a lesser included offense does not warrant reversal unless an examination of the entire cause, including the evidence, discloses that "it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 149; see *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

"Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085-1086.) Thus, the failure to give a lesser included offense instruction is often harmless where the jury is given other reasonable lesser offense options but rejects those options in favor of the charged offense. In such cases, the jury is not "forced [into] 'an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.' " (*People v. Lacefield* (2007) 157 Cal.App.4th 249, 262 (*Lacefield*), disapproved on other grounds in *People v. Smith* (2013) 57 Cal.4th 232, 242; see *People v. Dominguez* (1992) 11 Cal.App.4th 1342, 1353 [defendant charged with robbery; failure to instruct on lesser included offense of grand theft was harmless because jury was instructed on lesser included offense of petty theft and was thus not "put to an 'unwarranted all-or-nothing choice' "]; cf. *People v. Lipscomb* (1993) 17 Cal.App.4th 564, 571 [defendant charged with assault with a firearm; failure to instruct on lesser related offense of brandishing was harmless where the jury "was not faced with an all-or-nothing choice" because it was instructed on other lesser related offenses].)

5

The California Supreme Court applied these principles in *People v. Rogers* (2006) 39 Cal.4th 826 (*Rogers*), where the defendant was charged with first degree murder. The *Rogers* court held that the trial court should have instructed the jury on the express malice form of second degree murder. However, the error was harmless because the jury had been given other lesser offense options, including the implied malice form of second degree murder, but convicted the defendant of first degree murder. (*Id.* at pp. 867-868.) The *Rogers* court similarly found that any error in failing to give an involuntary manslaughter instruction was harmless because the jury had rejected the lesser options of second degree murder and voluntary manslaughter. (*Id.* at p. 884; see also *People v. Barnett* (1998) 17 Cal.4th 1044, 1156 [failure to give involuntary manslaughter instruction harmless where jury found defendant guilty of first degree murder "in the face of exhaustive instructions pertaining to the lesser included offenses of second degree murder and voluntary manslaughter"].)

Courts from other states have applied the same principles in finding harmless a trial court's failure to instruct on a lesser included sex offense if the jury was given a lesser offense option such as battery. For instance, in *Sherrer v. State* (Fla.App. 2005) 898 So.2d 260, the defendant was charged with, and convicted of, "lewd and lascivious molestation." (*Id.* at p. 261.) On appeal, he argued that the trial court should have instructed the jury on the lesser included offense of "unnatural and lascivious act." (*Ibid.*) The court found the error harmless "because the court did instruct the jury on simple battery as a lesser-included offense. [Citations.]" (*Ibid.,* fn. omitted; see also *State v. Bowles* (Tenn. 2001) 52 S.W.3d 69, 78 [defendant charged with aggravated rape; failure to instruct on sexual battery harmless where jury was given the option of convicting defendant of rape and aggravated sexual battery].)

Here, in count 1, defendant was charged with sexual penetration of a child in violation of section 288.7, subdivision (b). Although the trial court did not give the jury the lesser-included offense option of attempted sexual penetration, it did give the jury the

6

option of convicting him of battery as a lesser offense.[3] The jury was instructed that defendant was guilty of battery if he "willfully and unlawfully touched [the victim] in a harmful or offensive manner." (See CALCRIM No. 960.) Thus, the jury had an option to convict defendant of a lesser crime if the jury believed defendant touched the victim in an offensive manner but did not believe that he penetrated her. Because the jury had the option to convict defendant of battery, the absence of an instruction on attempted sexual penetration did not "force[] 'an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.' " (*Lacefield, supra,* 157 Cal.App.4th at p. 262.) Since the jury did not choose that option, instead convicting defendant of the charged crime of sexual penetration, the error was harmless. (See *Rogers, supra,* 39 Cal.4th at p. 884 [failure to instruct on lesser included offense was harmless where the jury rejected other "lesser options"].)

Significantly, in count 3, in which defendant was charged with committing sexual penetration of a child in 2009, the jury was given the same lesser option of battery. The evidence of penetration as to count 3 was also equivocal, and in that count, the jury found defendant not guilty of sexual penetration but guilty of battery, the lesser option. Thus, in count 3, the jury found beyond a reasonable doubt defendant touched the victim in an offensive manner, but that he did not penetrate her. If the jury did not believe, beyond a reasonable doubt, that defendant penetrated the victim in 2010, the jury likewise could have convicted defendant of battery, rather than sexual penetration of a child, in count 1. Because the jury made that distinction as to count 3, but not as to count 1, it is not reasonably probable that the jury would have convicted defendant of attempted sexual

---

[3] The trial court instructed the jury that "[t]he crime of simple battery is lesser to that of every charged count." We need not decide whether battery is a lesser *included* or lesser *related* offense of penetration of a child (§ 288.7, subd. (b)). (Cf. *People v. Santos* (1990) 222 Cal.App.3d 723, 739 [battery is a lesser related offense of forcible penetration (former § 289, subd. (a))]; *People v. Shockley* (2013) 58 Cal.4th 400, 402 [battery is not a lesser included offense of lewd acts with a child (§ 288, subd. (a))].)

7

penetration, had it been given that additional option. (See *Watson, supra,* 46 Cal.2d at p. 836.)

It is also significant that the evidence of penetration in 2010 (count 1) was stronger than in 2009 (count 3). In 2010, the victim's mother saw defendant with his hand inside the victim's pants. Although the victim's testimony and statements about the 2010 incident were equivocal concerning penetration, she did make several statements in which she described defendant's fingers or entire hand inside her vagina. As to the 2009 incident, there were no other witnesses, the victim's statements were less detailed, and the victim could not recall that incident when she testified at trial. On this record, the jury distinguished between the evidence supporting the two charges and convicted defendant of sexual penetration of a child as to the 2010 incident but only convicted him of battery as to the 2009 incident.

The trial court's failure to instruct on attempted sexual penetration was not prejudicial simply because the victim's testimony and statements were equivocal concerning whether defendant had penetrated her. As the prosecution's expert testified in this case, molested children often minimize the extent of the abuse, and it is common for molested children to be confused about details or give conflicting information about what happened. The jury heard the expert testimony and the victim's testimony and statements, and the jury found beyond a reasonable doubt that defendant penetrated the victim in 2010 but not in 2009.

Finally, the jury was instructed on the elements of the charged offense, which required a finding that defendant "engaged in an act of sexual penetration with [the victim]." [4] (See CALCRIM No. 1128.) The jury was also instructed that the prosecution

---

[4] The jury was instructed: "The defendant is charged in Counts 1 and 3 with engaging in sexual penetration with a child under ten years of age or younger, in violation of Penal Code section 288.7(b). [¶] To prove that the defendant is guilty of this crime the People must prove that, one, the defendant engaged in an act of sexual penetration with [the victim]; two, when the defendant did so, [the victim] was ten years of age or

8

had to prove defendant guilty of each charged offense beyond a reasonable doubt. (See CALCRIM No. 220.) Thus, the jury was instructed it could not convict defendant of sexual penetration of a child in count 1 unless it believed, beyond a reasonable doubt, that defendant engaged in an act of sexual penetration during the 2010 incident.

In sum, because the jury had a reasonable alternative for conviction if it found no penetration as to count 1, because the jury convicted defendant of the lesser offense as to the penetration charged in count 3, and in light of the evidence and other instructions given, I would find that the trial court's failure to instruct on attempted sexual penetration was harmless under *Watson, supra,* 46 Cal.2d at page 836.

### C. General/Specific Intent Instruction

I agree with the majority that the trial court should have given a specific intent instruction as to count 1 rather than a general intent instruction.

Section 288.7, subdivision (b) incorporates the definition of sexual penetration contained in section 289. Section 289, subdivision (k)(1) specifies that " '[s]exual penetration' is the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening *for the purpose of sexual arousal, gratification, or abuse* by any foreign object, substance, instrument, or device, or by any unknown object." (Emphasis added.) Thus, "the crime of unlawful sexual penetration requires the specific intent to gain sexual arousal or gratification or to inflict abuse on the victim." (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1538.)

---

younger; three, at the time of the act, the defendant was at least 18 years old. [¶] Sexual penetration means penetration, however slight, of the genital opening of the other person by any foreign object for the purpose of sexual abuse, arousal, or gratification. [¶] Penetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort. [¶] A foreign object, substance, instrument, or device includes any part of the body except a sexual organ."

Pursuant to CALCRIM No. 250, the jury was instructed: "For you to find a person guilty of the crimes charged in Counts 1 and 3 and the lesser included offense of simple battery . . . [¶] . . . that person must not only commit the prohibited act, but must do so with wrongful intent. [¶] A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime."

CALCRIM No. 251 was given only as to counts 2 and 4. If that instruction had been given as to count 1, it would have told the jury that in order to find defendant guilty, it had to find defendant "not only intentionally commit the prohibited act" but that he did so with a specific intent and/or mental state. The instruction would have told the jury that the act and the specific intent and/or mental state required "are explained in the instruction for that crime." (See CALCRIM No. 251.)

I agree that any error in failing to instruct the jury with CALCRIM No. 251 as to count 1, rather than with CALCRIM No. 250, was harmless error under any standard. Based on the evidence in the record and because the sexual penetration instruction told the jury it had to find defendant committed the penetration "for the purpose of sexual abuse, arousal, or gratification," there is no reasonable probability the jury found that defendant penetrated the victim for a purpose other than sexual arousal, gratification, or abuse. (See *Watson, supra,* 46 Cal.2d at p. 836.) Beyond a reasonable doubt, defendant would not have obtained a more favorable result had the jury been properly instructed that count 1 required a specific, rather than general, intent. (*Chapman, supra,* 386 U.S. at p. 24.)

### D. Cumulative Prejudice

Finally, I agree with the majority that there was no cumulative prejudice stemming from the two instructional errors concerning count 1. I agree that the instructional error concerning count 4 did not have any cumulative effect on count 1, and likewise that the instructional errors concerning count 1 did not have any cumulative effect on count 4.

10

## *E.* *Conclusion*

For the reasons stated above, I would reverse defendant's conviction in count 4 (§ 288, subd. (b)(1)) only.  I would affirm defendant's convictions in count 1 (§ 288.7, subd. (b)), count 2 (§ 288, subd. (b)(1)), and count 3 (§§ 242/243, subd. (a)).

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

11

| Trial Court: | Santa Clara County<br>Superior Court No.: C1083378 |
|---|---|
| Trial Judge: | The Honorable Andrea Y. Bryan |
| Attorney for Defendant and Appellant<br>Giai Van Ngo: | Thomas M. Singman<br>under appointment by the Court of<br>Appeal for Appellant |
| Attorneys for Plaintiff and Respondent<br>The People: | Kamala D. Harris,<br>Attorney General<br><br>Dane R. Gillette,<br>Chief Assistant Attorney General<br><br>Gerald A. Engler,<br>Senior Assistant Attorney General<br><br>Masha M. Dabiza,<br>Deputy Attorney General<br><br>Christopher J. Wei,<br>Deputy Attorney General |