Filed 11/23/15  P. v. Diederich CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060198 |
| v. | (Super.Ct.No. RIF1303052) |
| PAUL WALTER DIEDERICH, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge.

Affirmed with directions.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Ryan H.

Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Paul Walter Diederich, Jr., appeals after he was convicted of five counts of sexual offenses, four committed against K.C., his step-granddaughter, and one committed against D.M., who had been a foster child in defendant's home several years earlier. As to the offenses against K.C., defendant contends the trial court erred in failing to instruct sua sponte on attempted sexual penetration of a child, as a lesser included offense of sexual penetration of a child. We conclude the trial court did not err in failing to give sua sponte instructions on attempt, because there was no substantial evidence to support that offense. Accordingly, we affirm the judgment. Defendant has also requested correction of a clerical error in the abstract of judgment; we order the abstract corrected.

<u>FACTS AND PROCEDURAL HISTORY</u>

At the time of trial on the charged offenses against K.C., she had just turned seven years old. Defendant was the stepfather of E.R.; E.R. was the mother of K.C. At the time of trial, defendant was 69 years old. He had divorced his first wife in 2003, after 43 years of marriage. At the time of the incidents involving K.C., defendant was married and living with his second wife, Maria. K.C. considered "Grandma Maria" and "Grandpa Walt" (defendant) her grandparents.

In her testimony, K.C. described incidents that had taken place when she was five or six years old. K.C. would often visit her grandparents and would sometimes spend the night with them. When K.C. spent the night, she would sleep in her grandparents' bed, usually between her grandmother and defendant.

2

K.C. described an incident that happened one morning, while her grandmother was in the kitchen making breakfast. K.C. and defendant were still in the bedroom. Defendant touched K.C. on her "private," putting his hand on her genital area, inside her pants but outside her underwear.

K.C. testified that there was another time that defendant touched her. The prosecutor asked K.C. where the second time occurred; she replied, "The same thing." The prosecutor asked, "So in his bedroom?" K.C. replied, "Yes." On that occasion, K.C. testified it was nighttime. Defendant was on the right side of the bed, K.C.'s grandmother was in the middle, and K.C. was sleeping on the end. The prosecutor asked, "And what happened?" but K.C. said, "He didn't do anything."

The prosecutor attempted to clarify, asking K.C. if there was another time where defendant did something. K.C. said, "He did not." However, when the prosecutor asked K.C. how many times defendant had touched her, she made a hand gesture indicating "two." K.C. said that defendant had touched her the second time at night. Everyone was asleep. Defendant touched K.C.'s "private" with his hand. She felt his hand go inside her. K.C. told defendant to stop, but he kept going. After each incident, defendant warned K.C., "Don't tell."

On cross-examination, K.C. reiterated that defendant had touched her two different times.

K.C.'s mother testified that defendant was her stepfather. When the mother had made a trip to Florida, around October 28, 2012, she left K.C. in the care of her mother

3

and defendant. The mother picked up K.C. on or about November 1, 2012. It was at that time that K.C. first revealed to her that defendant had touched K.C.'s "private."

After K.C. had told her mother about the touching, K.C.'s mother contacted D.M. D.M. was now an adult, but defendant had been D.M.'s foster father when D.M. was a child. K.C.'s mother called D.M. and asked if defendant had ever done anything to her; D.M. stated that he had.

K.C.'s mother also told the grandmother, Maria, about K.C.'s revelations. The grandmother testified that she was defendant's wife. She confirmed that K.C. would sometimes sleep between her and defendant when K.C. spent the night at her home. The grandmother confronted defendant about K.C.'s allegations. Defendant said that K.C. had touched herself. He also stated, however, that K.C. had touched defendant's private parts three different times.

The prosecution presented the testimony of Jackie Saldana, a child forensic interviewer. Saldana interviewed K.C. on December 13, 2012. A video recording of the interview was played for the jury. K.C. was six years old at the time of the interview. K.C. told Saldana that defendant had touched her, and said, "the first time he touched me was like four fingers in." K.C. said that this had happened when she was six years old. K.C. could not remember or describe what it felt like when defendant did that to her. K.C. also told Saldana that defendant had done "the same thing," another time when she was five years old.

Riverside Police Department Detective Aurelio Melendrez received notice of the allegations on or about November 20, 2012. The last incident reported to have taken

4

place had occurred on October 28, 2012. Because of the gap in time, Detective Melendrez believed that the likelihood of finding any evidence from a physical examination was low; consequently, no medical examination of K.C. was conducted.

Detective Melendrez recorded an interview with defendant about the allegations concerning K.C. The detectives advised defendant of his constitutional rights. Defendant at first expressed some reluctance, and wondered whether he should have an attorney present, but he continued to converse with the detectives without making an express request for an attorney.

Defendant told the detectives that K.C. was acting out after seeing a Justin Bieber concert. Defendant theorized that, during the concert, K.C. must have seen "the acting roles, the dancing roles, a lot of it's just young kid stuff." Defendant claimed that K.C. was "re-enacting a bunch of stuff that isn't what you normally have in a household and it didn't come from me."

Defendant ultimately described four separate incidents in which his hand touched K.C., but defendant claimed in three of these instances that K.C. had grabbed his hand and used it to touch herself. In one incident, defendant, the grandmother, and K.C. were on vacation in Paso Robles. Defendant was alone in a bedroom, lying on the bed, awake. K.C. came into the room and was "horsing around." Defendant claimed he was "patting" K.C., and "loving her back," when K.C. grabbed his hand. Defendant said that K.C. put his hand "down there" and tried to rub herself on his hand.

Defendant remembered another similar incident: Defendant was "just laying there," when K.C. came into the room. He told the officers that "she's playing in it again,

5

just you know, I'm—I put my arms around her like this [demonstrating] and she just grabs my hand." Defendant amended his account of the first incident, saying that K.C. "didn't rub the first time, it was just patting," but that "[t]he second time was when she started to move my hand." When defendant realized K.C. was using his hand to stimulate herself, "that's when I explained and put her hands and said, it's yours, you do it yourself."

Another incident took place at defendant's home. Defendant was lying on his side on the couch, watching television. K.C. was showing off, dancing in front of the television. Then she jumped up and sat on defendant's hip, "doing a grinding act," before she lay on top of defendant, and kissed defendant hard on the mouth. Defendant was surprised, and at first it was difficult to sit up, with K.C.'s weight on him. Defendant forced himself up, and instructed K.C. that it was improper to give a hard kiss. Defendant again explained to K.C. that her private area was private, and that the only person who should touch K.C. in that area was herself.

Another incident occurred in the grandparents' bedroom at home, while everyone was asleep. Defendant claimed that he was sleeping, when K.C. had put his hand "in there," i.e., inside her underwear; K.C. had pulled her pants to one side, and defendant woke up when he felt his hand touching skin on skin. Defendant said he put K.C.'s hand "down there," and reminded her, "do it yourself, it's yours, your private. Not for me, not for anybody else."

During the interview, defendant talked to the detectives about another past incident that came to light. Defendant and his daughter "had a curiosity thing," when she

6

was young.  When she was nine years old, defendant's daughter had slipped into bed beside defendant, and she was "playing around" and "grabbing."  In the course of this activity, defendant's daughter grabbed defendant's penis.  Defendant admitted that he was sexually aroused at the time.  Defendant asserted that he had "talked it out" with his daughter, and that "there's never been an incident since this came up."  Defendant categorically denied that anything had happened with D.M.

Defendant also complained to the interrogators that, "no matter what you do, no matter how old you are, no matter what it is, she's the young child, and she is, and if she was touched, kill the guy."  Defendant lamented that the grandmother had filed divorce papers and asked defendant to move out of the home.  Defendant blamed the grandmother for being too lenient with K.C.'s mother when she was young:  "her daughter thinks she's a movie star, . . . [and] her granddaughter is becoming the same."

As already noted, the investigation had revealed allegations that defendant had committed a similar offense against D.M., defendant's former foster daughter.  D.M., age 29 at the time of trial, testified that defendant was "like a grandfather" to her when she was growing up.  When D.M. was between three and six years old, an incident happened when defendant touched her genitals.  D.M. remembered that it happened in defendant's house in Glendora.  D.M. was sitting on defendant's lap, when he put his fingers inside her underwear and fondled her genitals.  As she remembered it, defendant did not penetrate her; his action was more "like feeling around."

7

D.M. did not tell anyone about the molestation until she was about 20 years old, when she told a therapist. K.C.'s mother called D.M. in 2012 and asked if defendant had ever done anything to her as a child. D.M. told K.C.'s mother that he had.

As a result of the report to police and the subsequent investigation, defendant was charged with five counts: Counts 1 through 4 related to K.C. Counts 1 and 2 both concerned the first incident of touching, and alleged the offenses of oral copulation or sexual penetration with a child 10 or more years younger than defendant (Pen. Code, § 288.7, subd. (b)), and performing a lewd act upon a child under age 14 (Pen. Code, § 288, subd. (a)), respectively. Counts 3 and 4 related to the second time defendant touched K.C., and alleged the same two offenses. Count 5 concerned D.M., and alleged a third count of committing a lewd act upon a child under age 14 (Pen. Code, § 288, subd. (a)).

At trial, defendant presented medical and other evidence, and testified in his own behalf.

Defendant's physician, Dr. Muhammad Mowjood, testified that defendant's first visit to his office was in October 2011. Defendant's conditions, discerned through a patient history and physical examination, included an umbilical hernia, fluid-filled cysts in the testicles, and an enlarged prostate. The medication defendant was prescribed to treat his prostate could cause, as potential side effects, decreased libido and erectile issues. An ultrasound of defendant's testicles showed some evidence of an untreated inguinal hernia.

The defense also called San Bernardino County Deputy Sheriff Michael Paredes, who had gone to the home of K.C.'s mother to investigate the molestation allegations. Deputy Paredes first met K.C.'s mother outside the house. They went inside, and Deputy Paredes also interviewed defendant's wife, Maria, in the living room of the residence. Then, he interviewed K.C., the alleged victim, in a bedroom. K.C.'s mother was also present. K.C. was quiet and reserved when Deputy Paredes spoke to her. At times she did not respond to his questions, but she did say that someone had touched her privates, and then elaborated that "'Grandpa Walt touched me.'" Deputy Paredes did not intend to conduct a full forensic interview with K.C., and did not order a medical examination. He viewed his role as merely to establish whether a crime had been committed, and who may have committed it. He did not want to interfere with the investigation to be conducted by the Riverside Police Department, the primary investigating agency.

Defendant also testified in his own behalf. He testified that he was divorced from his first wife, Ann, in 2003; they had been married for 43 years. Defendant and Ann had a daughter, Shannon. Defendant acknowledged talking about Shannon in his police interview. He stated that, when Shannon was eight or nine years old, an incident of touching occurred. According to defendant, he was lying naked in bed. Shannon came into the room and climbed on the bed "to jump and play. Shannon pulled the covers off defendant. Defendant had a "morning erection," and Shannon grabbed his penis. Defendant felt that Shannon's behavior was inappropriate, and he attempted to "talk it out," rather than shock the child.

9

As to D.M., defendant testified that he and Ann had been foster parents to D.M. They knew D.M.'s mother, and had sometimes babysat D.M. since she was about one-and-a-half years old. Defendant and Ann began taking care of D.M. regularly, when D.M. was about four years old. When D.M. was 13 or 14, defendant and Ann became D.M.'s foster parents. She lived in defendant's home full time from about age 14 to 18.

When D.M. was very young, between the ages of about three and six, defendant described how she would jump up in his lap, and then slide down his leg. She would sit on his foot and he would drag her around the kitchen. Defendant denied touching D.M.'s vaginal area.

As to K.C., defendant testified that he had known K.C.'s mother for many years; he had known K.C. since she was born, and considered her his granddaughter. K.C. would stay overnight with defendant and Maria frequently. Defendant said that they visited with K.C. at least every month, and took K.C. on vacation. Defendant and Maria would also sometimes stay overnight in K.C.'s home, while K.C.'s mother was absent, attending night classes or having "a little more social life," as defendant put it.

Defendant recounted the incidents he had told Detective Melendrez about in his police interview. In 2012, K.C. was five or six years old. Defendant noticed that, after K.C. had been taken to a concert of one of her favorite singers, she began to behave inappropriately. Defendant and K.C. were watching television, a few days after the concert. Defendant was watching while lying on his side, when K.C. jumped on top of defendant and did a grinding action. Defendant said, "'What are you doing?'" K.C. then "slammed down hard on [defendant's] face with her chin and mouth and locked up," in a

10

full kiss. Defendant was surprised and had difficulty getting up with K.C. on top of him. He "pick[ed] her up off of [him]," and set her down, saying, "'You don't kiss like that. That's not right. You shouldn't kiss hard like that. That's not right.'" Defendant felt that K.C. was "[o]bviously" enacting something that she had seen.

About two weeks later, another incident occurred. Defendant and Maria were staying in a room at the home of Maria's brother. K.C. also spent the night with defendant and Maria in their room. K.C. was sleeping on the side of the bed next to the wall, Maria was in the middle, and defendant was on the opposite side. Maria had gotten up to start cooking breakfast in the kitchen. K.C. had gotten up also, but defendant remained in bed. A short while later, K.C. came back to bed. Defendant testified that, "[t]he next thing I know," K.C. had grabbed his hand and wrist, placed it in her vaginal area and "moved it slightly." Defendant slapped K.C. twice on her underwear and told her that, "'No one touches your private parts, nobody but nobody.'" Defendant also told K.C. that, if she wanted "'to be felt,'" to do it herself.

The last incident occurred approximately two weeks after the second one. During the night, defendant woke suddenly to find himself lying on his stomach, with his arm on K.C.'s stomach, and his "knuckles . . . basically buried right into [K.C.'s] vagina area." Defendant denied penetrating K.C., and maintained any touching was unintentional, with the back of his hand.

Defendant also corroborated Dr. Mowjood's testimony, to the effect that defendant suffered from hernias in his groin area, as well as prostate and libido issues. He claimed to be unable to achieve an erection.

11

The defense theory, as summarized in closing argument, was that all the touchings were accidental or without any sexual intent.  Defense counsel suggested that the primary victim, K.C., was lying, exaggerating, or misinterpreting what had happened.  Counsel suggested that the manner of questioning by K.C.'s mother, by police and by the forensic interviewer led K.C. to say what she had said.  Counsel faulted the prosecution for failing to produce K.C.'s pajamas or to have a medical examination conducted to corroborate K.C.'s testimony.  In addition, counsel argued that defendant's low libido, and physical problems resulted in his inability to get an erection; if defendant knew from the outset that he could not respond sexually, it would make no sense for him to touch the victims with any sexual intent.

The jury, however, did not credit defendant's evidence, and returned verdicts finding him guilty on all five charges.

The trial court sentenced defendant to a combined aggregate term of 38 years to life in state prison, consisting of consecutive terms of 15 years to life for counts 1 and 3, and the aggravated term of eight years on count 5, consecutive to the terms in counts 1 and 3.  The trial court imposed the middle term of six years on counts 2 and 4, but stayed those terms pursuant to Penal Code section 654.  The court also imposed various fines and fees, calculated defendant's custody credits, and imposed other ancillary orders.

Defendant filed a timely notice of appeal on the day of sentencing.

ANALYSIS

I.

The Trial Court Was Not Required to Instruct Sua Sponte on Attempted Penetration

The primary contention on appeal is that the trial court erred in failing to instruct sua sponte on a lesser included offense of attempted sexual penetration of a child age 10 or under, with respect to the charges in counts 1 and 3. (Pen. Code, §§ 21a, 288.7, subd. (b).)

A court must instruct on the general principles of law applicable to the issues raised by the evidence, with or without a request. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater offense. (*People v. Whalen* (2013) 56 Cal.4th 1, 68; *People v. Rogers* (2006) 39 Cal.4th 826, 866.) However, there is no duty to instruct on a lesser included offense when the evidence is minimal and insubstantial. (See *People v. Barton* (1995) 12 Cal.4th 186, 201.)

On appeal, we review the failure to instruct on a lesser included offense independently. (*People v. Licas* (2007) 41 Cal.4th 362, 367; *People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

Penal Code section 288.7, subdivision (b), provides: "Any person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished

13

by imprisonment in the state prison for a term of 15 years to life." Here, there was no allegation and no evidence of oral copulation; the charged offenses were predicated on sexual penetration of K.C.

The offense of sexual penetration with a child incorporates the definition of "sexual penetration" set forth in Penal Code section 289. (*People v. Ngo* (2014) 225 Cal.App.4th 126, 157.) "'Sexual penetration'" is defined as "the act of causing the penetration, however slight, of the genital or anal opening of any person . . . for the purpose of sexual arousal, gratification, or abuse by any foreign object . . . [¶] [including] any part of the body, except a sexual organ." (Pen. Code, § 289, subds. (k)(1), (2).)

Penal Code section 288.7, sexual penetration of a child, is a specific intent crime. (*People v. Ngo*, *supra*, 225 Cal.App.4th 126, 157.) Penal Code section 21a, defining the elements of attempt, does not add a specific intent element that is not present in the completed offense; the attempted offense therefore qualifies as a lesser included offense on the elements test. (*Ibid*.)

Defendant argues that substantial evidence supported an instruction on the lesser included offense of attempted sexual penetration. We disagree. K.C. told authorities that, the first time defendant touched her, when she was five or six years old, he had put "like four fingers in." She also said he had done "the same thing" another time, when she was five years old. She did not remember or could not describe what it felt like when defendant put his fingers inside her, but she was only seven years old at the time of trial. At trial, K.C. stated that she felt defendant's fingers inside her vagina.

14

On the other hand, defendant adamantly denied ever penetrating K.C. at any time. According to defendant's trial testimony, he had only ever touched K.C.'s genital area over her clothes and by accident or without any sexual intent (e.g., when he pulled his hand away from her groin, patted her vaginal area, and told her that that was her private area, only to be touched by her and no one else). In his police interview, defendant described only one time when his hand was inside K.C.'s underwear. Defendant told police that he had been asleep and had woken "touching skin"; he steadfastly maintained that K.C. must have placed his hand there herself. At trial, defendant denied that his hand was inside her underwear on that occasion.

Defendant urges that, "[g]iven [his] detailed testimony"—i.e., that he had put his hand on or against K.C.'s vaginal area and his "strong denial of penetration"—together with "K.C.'s very generic testimony regarding penetration," the combination of these two accounts constituted substantial evidence supporting an instruction on attempt with respect to counts 1 and 3. We fail to see how clear testimony from K.C. that defendant had penetrated her, and defendant's plain and adamant denials of any penetration, or even any contact with K.C.'s vaginal area except over her clothes and without any sexual intent, could be viewed as evidence of attempted penetration. There was no evidence that defendant had made a direct but ineffectual effort to penetrate K.C. Rather, the evidence showed either that defendant had penetrated K.C., or that he had not done so at all. If the jury deemed K.C.'s testimony of penetration insubstantial, it was required to acquit defendant on counts 1 and 3, but there was no evidence showing that defendant had attempted to sexually penetrate K.C., but failed.

15

The court was not required to instruct on its own motion on the lesser included offense of attempted sexual penetration.

## II.

### The Abstract of Judgment Must Be Corrected

Defendant also points out that the abstract of judgment recites that all five offenses occurred in 2012. Count 5, the offense against D.M., was in fact alleged to have occurred in 1988 or 1989. At the preliminary hearing, D.M. testified that the incident took place when she was approximately five years old, in 1988. D.M. was age five from late 1988 through late 1989.[1] D.M. reiterated at trial that she was between three and six years old at the time of the offense, and agreed that the incident happened "around" the time that she was five years old.

The People agree that the abstract of judgment is erroneous, and that the offense alleged in count 5 occurred much earlier. Accordingly, we order the abstract of judgment corrected to reflect that the offense stated in count 5 occurred in 1988 to 1989. Where a party "identifies an evident discrepancy between the abstract of judgment and the judgment that the reporter's transcript and the trial court's minute order reflect, the appellate court itself should order the trial court to correct the abstract of judgment." (*People v. Mitchell* (2001) 26 Cal.4th 181, 187-188.)

---

[1] The amended information mistakenly asserts that the offense occurred from "November 20, 1989, [*sic*] through and including November 19, 1989." The first date is clearly intended to be November 20, 1988.

16

## DISPOSITION

The trial court was not required to instruct sua sponte on attempted sexual penetration with respect to counts 1 and 3.  The judgment is affirmed.

The trial court is ordered to correct the abstract of judgment to reflect that the offense stated in count 5 occurred in 1988-1989.  The court is further directed to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:


HOLLENHORST
Acting P. J.


CODRINGTON
J.

17