Filed 7/20/16  P. v. Nerio CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>FRANCISCO NERIO,<br><br>　　　Defendant and Appellant. | B268107<br><br>(Los Angeles County<br>Super. Ct. No. LA075486) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas Rubinson, Judge.  Affirmed in part; remanded in part with instructions.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback, II and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Francisco Nerio appeals from the judgment entered following his conviction by jury on 17 counts of sexual intercourse or sodomy with a child, oral copulation or sexual penetration of a child, and lewd acts upon a child. He contends the trial court erred in failing to instruct the jury on lesser included offenses of attempted sexual intercourse and attempted sodomy. Defendant further raises issues with the calculation of his presentence custody credit and the amounts of two fees imposed by the trial court. We find no error as to the jury instructions and therefore affirm the convictions. However, we agree—as ultimately conceded by both parties—that defendant should be awarded one additional day of presentence custody credit and the amount of the facilities assessment imposed should be reduced to $510. We accordingly remand to the trial court with directions to correct the abstract of judgment.

## PROCEDURAL HISTORY

The Los Angeles County District Attorney (the People) filed an amended information on August 24, 2015 charging defendant with six counts of sexual intercourse or sodomy with a child ten years of age or younger (Pen. Code, § 288.7, subd. (a) (288.7(a))[1], counts 2-7), four counts of oral copulation or sexual penetration of a child ten years of age or younger (§ 288.7, subd. (b), counts 8-11), and seven counts of lewd acts upon a child 14 years old or younger (§ 288, subd. (a), counts 12-18). The People alleged that defendant committed all counts against K.E., his stepdaughter, between 2007 and 2010 (counts 2-7 and 9-11), 2006 and 2010 (count 8), and 2004 and 2012 (counts 12-18). Defendant pled not guilty to all charges.

On August 26, 2015, a jury found defendant guilty on all counts. The court sentenced defendant to consecutive terms of 25 years to life on each of counts 2 through 7, and 15 years to life on each of counts 8 through 11. In addition, the court imposed a determinate term of ten years, calculated using the upper term of eight years on count 12 as the base count and two years on count 18 as the subordinate count, both to run

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

consecutively. Finally, the court imposed two years each for counts 13 through 17, but stayed those sentences pursuant to section 654. The court also imposed various fines and fees, and awarded defendant 859 days of custody credits.

Defendant timely appealed.

## FACTUAL BACKGROUND

### I.     Prosecution Evidence

#### A.     *K.E.'s testimony*

K.E. was 15 years old at the time of trial. She started living with defendant, her stepfather, when she was about three years old, along with her mother and two younger siblings. They lived in a one-bedroom apartment on Sepulveda Boulevard. Defendant slept in the living room and the rest of the family slept in the bedroom.

K.E. testified that the first incident with defendant occurred when she was five years old. That night, she was sleeping in the living room on the sofa and defendant was sleeping on the floor. Her mother and siblings were in the bedroom. Defendant stood up and "just started touching my breast, and I remember him telling me, 'Don't tell your mom. Everything's okay.'" K.E. felt scared.

K.E. told her mother about the incident but her mother did not believe her. K.E. said that her mother asked defendant about it and defendant denied it. He continued to live with them after that.

When K.E. was about seven years old, defendant began touching her vagina. K.E. testified that he removed her pants and underwear and inserted his fingers, which hurt. When she was eight years old, K.E. recalled waking up on her back on the floor in the living room without pants or underwear on. Defendant got on top of her and inserted his penis "deep" into her vagina. She testified that "it was hurting me a lot" and she "felt like crying." She did not know if defendant ejaculated. Afterward, he put her clothes back on and she went to the bathroom. K.E. testified that her vagina was red and it "burn[ed]" when she urinated; she also saw some "black spots" coming from her vagina.

Defendant continued to insert his penis into her vagina every three months until she was 11 years old, at least 20 times in total according to K.E.'s estimate at trial. K.E.

3

tried to resist and move away but defendant "kept putting pressure on me" so she could not move him off of her. She did not tell anyone else because she thought that "what was going on was a dream, that I wasn't living it." She was also embarrassed and was afraid her mother would hit her.

K.E. testified at trial that defendant never put his penis in her bottom. She did not recall whether she ever testified that he had or ever told any of the investigators that he had. When confronted with her preliminary hearing testimony (given in April 2015) that defendant touched her bottom with his hands and put his penis inside her anus three times, K.E. agreed with that testimony. These incidents occurred when she was younger than 11 years old. K.E. also testified that defendant licked her vagina once. She later agreed when confronted with her preliminary hearing testimony that defendant had actually done so on two occasions. K.E. denied that defendant ever showed her any pornography.

K.E. further testified that defendant's brother, Roberto, touched her vagina and inserted his fingers twice. She did not recall her exact age but it was before she was nine.

When K.E. was 11, she became "scared that I was probably going to end up getting pregnant." She told her mother again about defendant's abuse and "she finally believed me." Defendant moved out of the home and the molestation stopped.

No one reported the abuse until September 2013. At that time, K.E.'s uncle (her mother's brother), testified that he learned about the abuse from another relative. He reported it to K.E.'s school officials, who notified the police.

K.E. testified that she was called to her school's counseling office in September 2013, where a police officer "started asking me questions about if I was ever sexually abused, and I just started crying and then I told him that it was true."

B.      *Investigation*

The same day the abuse was reported, K.E. placed a pretext call to defendant, assisted by a detective from the Los Angeles Police Department (LAPD), in an attempt to get defendant to " admit to what he did." A recording of the call was played during trial and the jury was provided with a transcript translated from Spanish. During the call, K.E.

4

told defendant that "some workers came" to her school and "wanted to talk to me about what happened when . . . we had sex." K.E. told defendant she did not know "who told them" and asked defendant if she should "tell them what happened." Defendant initially responded that "nothing happened," and that "there is nothing to explain." K.E. then said she thought they were "going to do a test on me . . . so, then they are going to see what is going to happen." Defendant responded "Well, yeah, you are a little girl.... I don't know, but no, no . . . I never did anything . . . well, like what you can say. I don't know. They are going to find out. I just know I didn't do things right. I know I made a mistake and well, I'm sorry. I ask you to forgive me. . . . I consider that I, I haven't harmed you." When K.E. said she "remember[ed] what happened," defendant said he would turn himself in, that he was not "going to run from something," and that "you have to confront everything."

Officer Christine Parks interviewed K.E. at school on September 30, 2013. K.E. told her that starting at age 5, defendant would lie down next to her at night, rub her breasts and vagina and digitally penetrate her vagina about once a week for approximately a year. The touching stopped, but later restarted. Then defendant would "routinely have [K.E.] leave her bedroom at night to go to the living room, where he then removed her pants and underwear and had penile vaginal sex with her." Defendant would have K.E. straddle him as he laid on the floor, and "would rock her up and down by grabbing her hips."

K.E. described defendant's penis and said she did not recall seeing him wear a condom. She said she was not sure if defendant ejaculated, but that after each incident she would feel a burning sensation while urinating, and "also observed a thick white substance coming from her vagina." The intercourse went on for approximately three years, from 8 to 11 years old, approximately twice a week. K.E. told Officer Parks that she attempted to resist, but defendant "would threaten her and tell her not to tell her mother." K.E. also recalled defendant licking her vagina approximately two times during the same time period.

5

Misty Molina, sexual assault nurse examiner, conducted a sexual assault examination on K.E. on October 8, 2013. She testified that during the examination, K.E. was "very tearful," and "scared," but "cooperative." K.E. reported that defendant "started to touch her" when she was about six years old, and described both digital and penile penetration of her vagina. K.E. also stated that defendant made her "watch pornography on his phone" and had her masturbate him with her hand. Additionally, K.E. told Molina that defendant had touched her breasts and orally copulated her. Molina initially testified that K.E. said defendant "had placed his penis on" her anal area, but that K.E. did not "specify any penetration." Later, Molina testified that she asked K.E. about whether defendant penetrated her anus with his penis, and K.E. "did say that that did happen," but did not say how many times it occurred. K.E. reported pain and bleeding both from her vagina and her anus.

K.E. also told Molina that defendant's brother, Ricardo, had put his fingers in her vagina "at least ten times."

Molina testified that K.E.'s genital examination revealed three transections, or "basically tears or cuts to the hymen," the ring of tissue around the vaginal opening. Two of the tears were "complete transection[s]" through the hymen to the base of the vagina, and the third tear went two-thirds of the way through. These injuries were consistent with what K.E. reported.

Molina further opined that K.E.'s injuries would likely have occurred from more than one episode of penetration, but she could not say so with absolute certainty. She testified that the injuries were "consistent with the penetration of a penis." It was "less likely to have tears like this in multiple locations with the penetration of a finger." While she "couldn't say with certainty," she concluded it "probably had to be a penis," based on the extent of the lacerations.

Detective Katherine Gosser, the investigating officer, testified regarding her interviews of both K.E. and defendant. Defendant voluntarily came into the police station on October 3, 2013 and asked to speak with someone because "he knew the police were looking for him." He was interviewed by Detective Gosser and a second detective,

6

who served as the Spanish translator.  The People played the video of the interview at trial and provided translated transcripts to the jury.[2]

　　During the interview, defendant said that three years before, he had committed "sexual harassment" of K.E., his stepdaughter.  After defendant was advised of his *Miranda* rights,[3] he told the detectives that the incidents had happened when K.E. was 11 or 12 years old and admitted that he had put his penis on K.E., but said "it was never to penetrate nor was it to rape or anything like that."  He said that sometimes K.E. "would stay with me" at night in the living room of their apartment, and she would watch television and fall asleep.  Detective Gosser then asked defendant about when he "had sex with her this first time . . . " and defendant responded "Everything was the same.  It was like . . . just uh, an act.  Not, not, not a relationship."  He added "it was just like on . . . just on top.  No, there was never penetration or anything like that."  Defendant stated that he and K.E. would be laying down, face to face, and the first time "it was normal."  He then reiterated, "make sure this is clear.  She was never penetrated. All the time it was . . . just an act."  Defendant acknowledged this happened "four or five times."

　　As the interview progressed, Detective Gosser mentioned that they had already examined K.E. and pressed defendant for further details regarding "sex" with K.E.  While defendant did not specifically state that he penetrated, or had sex, with K.E., he did respond multiple times in the affirmative to the detective's questions on that point.  For example, Gosser asked "how long was it before you started to have sex with [K.E.]?"  Defendant responded "it was about, about at 11 years old."  When Gosser asked whether sex actually began when K.E. was about eight years old, defendant said he did not remember, then that he was "confused if it was eight or nine."  He conceded it was "around that time," and about once a month or once every two months, until K.E. was about 11 years old.  Similarly, when Gosser asked him "when was the last time you had sex with her," defendant responded "She was about . . . 11 and a half years old."

---

[2] The excerpts detailed herein are from the English translation provided in the transcript.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

Defendant did not recall whether he ever put his penis in K.E.'s "bottom." He admitted that he told K.E. once not to say anything to her mother. He did not recall whether he put his mouth on her vagina, but then said "if she says so then . . . I accept it." He also admitted inserting his fingers into her vagina one or two times, when she was about nine years old.

Detective Gosser interviewed K.E. the following day, October 4, 2013. At trial, Detective Gosser testified that K.E. "expressed repeatedly how uncomfortable she is talking about this. She is not comfortable talking about her body parts. . . . She was very uncomforatble talking about the sexual acts." K.E. told Gosser that starting at age five, defendant "started to fondle her and digitally penetrate her, sort of over a period of time." Then, starting around age seven or eight, defendant "started to have intercourse with her" and continued to do so "on a repeated basis" until she was about 11 years old. K.E. stated that the incidents occurred in the living room, at night, when her mother and siblings were asleep. K.E. stated that "everything was very painful." She described experiencing vaginal burning and redness after each incident, as well as a "white, slimy fluid" coming out of her vagina. K.E. did not mention any oral copulation or anal penetration by defendant during her interview with Detective Gosser. Detective Gosser testified that she would never directly ask about certain sex acts during a sexual assault interview with a child; instead, she would let the child talk and then ask some follow up questions based on information the child gave.

Jose Larreynaga, social worker for the Department of Children and Family Services, interviewed K.E. in 2013 as part of the dependency proceedings. He testified that K.E. was "very depressed" when he talked to her. She told him that she would cry during the abuse and would get rashes. He also interviewed defendant in jail following his arrest. Defendant told him that "he had touched [K.E.] on four occasions," when she was about eight years old. Defendant refused to give further details and appeared nervous during the interview.

8

C. *Expert*

Dr. Susan Hardie, a nurse and developmental psychologist, testified as the People's expert in child sexual abuse and the behavior of abused children. Among other things, she explained why a child might delay disclosure of abuse, and that it was "common" for an abused child to give inconsistent statements and/or have difficulty remembering the details of the abuse.

## II. Defense Evidence

Dr. Earl Fuller, an obstetrician and gynecologist, testified as an expert for the defense. He opined that K.E.'s vaginal injuries were "consistent with sexual activity," but that the injuries were caused by digital penetration. He did not believe the injuries were consistent with penile penetration, which would cause greater damage to a prepubescent child. His opinion was based on the report by Misty Molina and the associated photographs, assuming the average size of a male penile erection and the average size of the hymenal opening in the vagina in a girl younger than ten. He had not examined K.E. or defendant. He agreed that two of the lacerations K.E. sustained were "significant" and that her injuries were consistent with sexual penetration under the age of ten. He also agreed that a "substantial amount of force" was necessary to cause K.E.'s injuries.

## DISCUSSION

## I. Instruction on Lesser Included Offenses

Defendant contends that the trial court erred in refusing to instruct the jury on attempted sexual intercourse and attempted sodomy of a child 10 years old or younger. He asserts these attempts were properly considered as lesser included offenses of counts 2 through 7, alleging sexual intercourse or sodomy with a child 10 years of age or younger pursuant to section 288.7(a). The Attorney General argues that the specific intent element of attempted sexual intercourse and attempted sodomy makes them ineligible to serve as lesser included offenses of completed crimes under section 288.7(a), which require only a general intent. We need not reach this issue. Even assuming the attempt crimes could be lesser included offenses, as defendant argues, we find there was

9

insufficient evidence to support such an instruction in this case.  Further, any error was harmless.

A.     Factual Background

At the close of evidence, defense counsel requested that the court instruct the jury on attempted sexual intercourse and attempted sodomy as lesser included offenses of the charged violations of section 288.7(a).  He argued that the evidence could support a finding of attempted sexual intercourse: "So it could be that the jury could accept that my client perhaps - like when he says he just put it on top, they could accept that perhaps he used his penis to tap her vagina or place it on top, perhaps attempt to go in but not actually go in.  That would support a theory of attempted sexual intercourse."

In response, the prosecutor argued that there was no substantial evidence to establish attempt, as "there's no testimony that he tried to penetrate."  The court agreed, noting that defendant was not arguing that he "tried to penetrate her and didn't.  There was no testimony from [K.E.] that 'he tried but couldn't because I stopped him' or 'he tried but his penis wouldn't go in' or anything like that. . . .  She said they were completed penetrations.  He says there was no penetration.  I don't see the evidentiary support."  Accordingly, the trial court denied defendant's request to give the instructions on attempt.

B.     Governing Principles

"[A] trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, . . . whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present. [Citations.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 215.)  "[T]his does not mean that the trial court must instruct sua sponte on the panoply of all possible lesser included offenses.  Rather, . . .'"such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"'

10

that the lesser offense, but not the greater, was committed.'" [Citation.]" (*Ibid.*; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

On appeal, "we employ a de novo standard of review and independently determine whether an instruction on the lesser included offense . . . should have been given." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

C.      Analysis

Defendant argues that the evidence at trial supported instructions for attempted sexual intercourse and attempted sodomy. We disagree.

Section 288.7(a) makes it a crime for "[a]ny person 18 years of age or older" to "engage[ ] in sexual intercourse or sodomy with a child who is 10 years of age or younger." "Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis. [Citations.]" (*People v. Mendoza* (2015) 240 Cal.App.4th 72, 79; see also CALCRIM No. 1127.) "Sodomy similarly requires penetration, however slight." (*Ibid*.; § 286, subd. (a).)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) Thus, in order to justify an instruction on attempt in this case, there must have been evidence from which a reasonable jury could find that defendant attempted to commit sexual intercourse or sodomy with K.E., but was unsuccessful. The record reflects no such evidence here. K.E. consistently claimed that defendant penetrated her vagina with his penis on multiple occasions. Defendant, on the other hand, denied any penetration. K.E. also testified at the preliminary hearing that defendant had put his penis in her anus and corroborated that testimony when confronted with it at trial. Defendant claimed he could not recall whether he had done so. Therefore, the record is devoid of any evidence that defendant attempted to engage in sexual intercourse or sodomy with K.E. but was unable to complete the act. In other words, even if the jury believed defendant's version of events, that evidence would not support an instruction on attempt. (See, e.g., *People v. Manriquez*, *supra*, 37 Cal.4th at p. 585.) Thus, the court did not err in failing to instruct on the offenses of attempted intercourse and attempted sodomy.

11

Defendant points to his statement that he put his penis "on" K.E.'s vagina, suggesting this evidence could negate even the slight penetration sufficient to establish a completed crime under section 288.7(a), and therefore could support a finding of attempted sexual intercourse. Assuming, for the sake of argument, defendant's premise that such contact would not constitute a completed penetration, defendant fails to identify any evidence suggesting that by placing his penis "on" K.E.'s vagina he was attempting to penetrate her. Indeed, during the same interview, defendant repeatedly claimed he never penetrated K.E. and never intended to do so. Similarly, we reject defendant's suggestion on appeal that "the jury could well have found on the evidence presented that [defendant] may have attempted, but, due to his inability to obtain an erection and/or the size of his penis compared to [K.E.'s] hymenal and anal opening, did not succeed" in penetration. This speculation is unsupported by any evidence in the record.

Defendant also cites *People v. Ngo* (2014) 225 Cal.App.4th 126 (*Ngo*) in support of his argument. This reliance is misplaced. In *Ngo*, the court found that the trial court had a sua sponte duty to instruct the jury on attempted sexual penetration with a child as a lesser included offense. (*Id*. at pp. 155–157.) The victim stated that the defendant touched her, but was equivocal as to whether he actually penetrated her. (*Id*. at p. 157.) The victim's mother testified that she saw the defendant touching the child, but she did not see whether he penetrated her. (*Ibid*.) The defendant admitted touching the victim, but denied that he penetrated her. (*Ibid*.) Thus, the court concluded the evidence was "consistent with the possibility that defendant attempted to penetrate B.T., but that Mother interrupted the attempt when she walked into the room," thereby constituting """'evidence that a reasonable jury could find persuasive'""" as to attempted sexual penetration. [Citation.]" (*Ibid*.)

Here, by contrast, there was no substantial evidence supporting attempted sexual intercourse or sodomy. Nor was there any argument to the jury that defendant made such attempts. Instead, the jury was presented with two opposing versions of events—the prosecution's version, based on K.E.'s testimony that defendant repeatedly had sex with and sodomized her, and defendant's version, in which he admitted to touching K.E. but

12

denied any penetration. Under neither version could the jury reasonably conclude that defendant attempted, but failed to complete, intercourse or sodomy with K.E. As such, the trial court properly refused to give instructions regarding attempt.

Further, we conclude that any such error would have been harmless. The failure to instruct on a lesser included offense in a noncapital case is subject to the *Watson* standard of error, requiring reversal only where "an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 165 [citing *People v. Watson* (1956) 46 Cal.2d 818, 836]; see also *Ngo, supra*, 225 Cal.App.4th at p.158.) Here, there was no reasonable probability that defendant would have been convicted of any lesser included offenses of attempted sexual intercourse or sodomy on counts 2 through 7, had the jury been given those instructions. As discussed above, there was no evidence that defendant tried but failed to have sex with, or sodomize, K.E. Moreover, the evidence supporting defendant's convictions for the completed crimes of sexual intercourse or sodomy was strong. There was no dispute that defendant engaged in sexual contact with K.E. when she was under 11 years old, or that defendant was over the age of 18 at the time. K.E. repeatedly and unequivocally testified regarding multiple incidents of sexual intercourse, beginning when she was about eight and continuing until she was ten or eleven years old. This testimony was confirmed by the numerous investigators who interviewed her, as well as by nurse Molina's testimony about the results of K.E.'s genital exam. Defendant himself admitted sexual contact with K.E. during his interview with Detective Gosser, and although he initially denied any penetration, he later affirmatively answered questions regarding having sex with K.E. And while K.E. testified as to at least 20 instances of intercourse and three instances of sodomy, defendant was only charged with six. As such, it was not reasonably probable that the inclusion of instructions regarding lesser included attempt offenses would have resulted in a more favorable outcome for defendant.

## II.    Presentence Credits and Fees

Defendant asserts that the trial court erred in the calculation of his presentence custody credits and in the amount of two fees imposed. We agree that two of these items

13

require correction, as detailed below. We additionally identify several other errors in the abstract of judgment that must be corrected upon remand.

First, defendant contends he is entitled to one additional day of presentence custody credit. The Attorney General concedes the error. We agree that defendant is entitled to 748 actual days of custody credit, not 747, reflecting his time in custody from October 3, 2013 until and including sentencing on October 20, 2015.

Second, defendant claims the court operations assessment imposed pursuant to section 1465.8 is incorrect.
his assessment is based on a flat amount ($40) multiplied by the number of convictions. (§ 1465.8, subd. (a)(1).) The court calculated defendant's fee based on his 17 convictions. In his opening brief, defendant contended he suffered only 16 convictions; however, he conceded on reply that the court's calculation was correct. Thus, no adjustment is necessary.

Third, both defendant and the Attorney General contend that the amount of the court facilities assessment imposed pursuant to Government Code section 70373 was incorrect. The statute provides for a court construction assessment of $30 "for each misdemeanor or felony." (Gov. Code § 70373, subd. (a).) Multiplying that amount by defendant's 17 convictions totals $510. Because the trial court imposed a fee of $540, the amount must be corrected.

Finally, our review of the record revealed several other clerical errors in the abstract of judgment. "Courts may correct clerical errors at any time, and appellate courts . . . that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts. [Citations.]" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Where there is an evident discrepancy between the abstract of judgment and the judgment that the reporter's transcripts reflect, the appellate court itself should order the trial court to correct the abstract of judgment. (*Id*. at p. 188.)

We conclude that the following discrepancies in the abstract of judgment are clerical errors that do not accurately reflect the judgment of the court and therefore

14

require correction: (1) on the first page of the abstract, the code section for count 7 should be corrected to read "288.7(a)"; (2) on the second page, in section 6.a., the applicable counts should read "08, 09, 10, 11"; and (3) on the third page of the abstract, in section 1, defendant's conviction on count 18 must be added, with a corresponding adjustment to the total time in section 8 from eight to ten years (eight years on count 12 and two years on count 18). It is clear from the transcript and minute order from defendant's sentencing hearing that the court imposed a two-year sentence (one-third the midterm) for count 18, to run consecutive to count 12.

## DISPOSITION

We remand this matter to the trial court with directions that it correct the abstract of judgment as follows: (1) the award for actual days of custody credit should be 748 days; (2) the court facilities assessment should be $510; (3) on the first page of the abstract, the code section for count 7 should read "288.7(a)"; (4) on the second page, in section 6.a., the applicable counts should read "08, 09, 10, 11"; and (5) on the third page of the abstract, in section 1, defendant's conviction on count 18 must be added, with a corresponding adjustment to the total time in section 8 from eight to ten years. Further, we direct the trial court to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

15